2005 OK 48

Mario BADILLO, Appellee/Counter–Appellant,

v.

MID CENTURY INSURANCE COMPANY, a California Corporation; Farmers Insurance Exchange, a California reciprocal or interinsurance exchange, Appellants/Counter–Appellees.

Nos. 98,136, 98,138.

Supreme Court of Oklahoma.

June 21, 2005.

As Corrected June 22, 2005.

1084

Mark E. Bialick, Gerald E. Durbin, II and Rodney D. Stewart of Durbin, Larimore & Bialick, Oklahoma City, OK, for Appellee/Counter–Appellant.

Eric S. Eissenstat, Stephen R. Stephens and Brooks A. Richardson of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, OK, for Appellants/CounterAppellees.

Kenneth G. Cole of Burch & George, Oklahoma City, OK, for amicus curiae, Oklahoma Trial Lawyers Association.

Phil R. Richards and Thomas D. Hird of Richards & Connor, Tulsa, OK, for amicus curiae, Oklahoma Association of Defense Counsel.

## ORDER

Rehearing is granted. The June 8, 2004 majority and dissenting opinions in the above-styled matter are withdrawn and the opinion issued this date is substituted therefor. Further, appellee/counter-appellant's request for oral argument contained in his petition for rehearing is denied. The vote below is on the grant of rehearing and denial of oral argument only. The vote on the substituted opinion is shown theron.

WATT, C.J., LAVENDER, EDMONDSON, TAYLOR and COLBERT, JJ., and SUMMERS, S.J. (sitting by designation in lieu of KAUGER, J.), concur.

WINCHESTER, V.C.J., HARGRAVE and OPALA, JJ., dissent.

KAUGER, J., recused.

PER CURIAM:

¶ 1 These appeals involve a suit by Mario Badillo, appellee/counter-appellant (insured) against Mid Century Insurance Company (MCIC) and Farmers Insurance Exchange (FIE), appellants/counter-appellees (insurers) for breach of the duty to act in good

faith and to deal fairly with him as their insured.[1] The case was tried to a jury, a verdict awarded insured $2,200,000.00 and judgment was entered thereon. Insurers appeal, contending trial court error in failing to direct a verdict for of one or both, and, alternatively, that other errors warrant reversal and a new trial. Insured counterappeals, asserting trial court error in granting a directed verdict to insurers as to his punitive damage claim, and in denying his quest for attorney fees and prejudgment interest. We have retained the appeals. In that no reversible error has been shown, we affirm the trial court's judgment on the jury verdict and orders denying insured's quests for attorney fees and prejudgment interest.

## PART I. GENERAL STANDARD OF REVIEW REGARDING ACTIONS AT LAW TRIED TO A JURY.

¶ 2 In *Florafax International, Inc. v. GTE Market Resources, Inc.,* 1997 OK 7, 933 P.2d 282 this Court set forth the general appellate standard of review concerning actions at law tried to a jury. This Court said in Florafax:

In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, this Court will not disturb the jury's verdict or the trial court's judgment based thereon. Where such competent evidence exists, and no prejudicial errors are shown in the trial court's instructions to the jury or rulings on legal questions presented during trial, the verdict will not be disturbed on appeal. In an appeal from a case tried and decided by a jury an appellate court's duty is not to weigh the evidence and determine which side produced evidence of greater weight, i.e. it is not an appellate court's function to decide where the preponderance of the evidence lies—that job in our

system of justice has been reposed in the jury. In a jury-tried case, it is the jury that acts as the exclusive arbiter of the credibility of the witnesses. Finally, the sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it.

933 P.2d at 287. (citations omitted).

¶ 3 In plain language, we are not allowed to substitute our judgment for that of the jury merely because we would have decided or viewed disputed material fact questions differently than the jury. Where competent evidence was presented at trial to support reasonable findings as to those material fact questions relating to the claim in suit and no reversible error is otherwise shown, an appellate court must affirm a judgment based on a jury verdict, not second-guess such judgment or the jury verdict upon which it is based. These general principles guide our review here.[2]

## PART II. FACTUAL AND PROCEDURAL BACKGROUND.[3]

¶ 4 On February 4, 2000, insured while driving his truck hit a pedestrian, Loretta Jean Smith, as she was crossing South Robinson at Southwest 25th Street in Oklahoma City. According to the police report, the collision occurred as insured made a right turn from eastbound 25th Street to go south on Robinson. Smith was seriously injured; she was in a comatose and/or semi-comatose state for much and, possibly all, of the time period between the date of the accident and April 17, 2000, the date her sister, Johnita Pamela Young filed suit, in a representative

1. Unless we refer to Mid Century Insurance Company (MCIC) or Farmers Insurance Exchange (FIE) by their acronyms, we refer to them collectively as insurers.

2. We note, when a more refined or specific review standard is applicable to a particular issue and we deem it necessary to do so, we discuss said standard along with our discussion of said particular issue.

3. Only those factual matters deemed necessary to properly dispose of the consolidated appeals or

to provide sufficient background information to understand the issues decided are set out. As the trial court was so required, we must view the evidence and the reasonable inferences therefrom in favor of the non-movant when reviewing the propriety of the trial court's rulings on a directed verdict. *See Gillham v. Lake Country Raceway,* 2001 OK 41, ¶ 7, 24 P.3d 858, 860. This requirement should be kept in mind in relation to our recitation of factual matters that were the subject of evidence introduced at the jury trial of this case.

capacity for Smith, against insured. Although her injuries were serious, Smith eventually recovered to such an extent it was no longer necessary for Young to act as a representative for her.

¶ 5 Smith incurred hundreds of thousands of dollars in medical bills for treatment received for injuries resulting from the collision. Insured had a $10,000.00 automobile liability policy issued by MCIC. MCIC and FIE are affiliated companies, both under the umbrella of the Farmers Insurance Group of Companies. FIE employees handled the claim made against insured under the policy of insurance. The policy gave MCIC authority to settle any claim made for the liability coverage as it deemed appropriate.

¶ 6 Insured informed insurers of the incident and insurers instructed him by letter not to discuss the case with anyone other than insurers or authorized representatives thereof. Insured testified that the adjuster (Mr. Wallis) handling the claim for insurers told him telephonically basically the same, i.e., do not talk to anyone about the accident and to refer any contact concerning it to the adjuster. In another letter, insurers informed insured that the value of Smith's claim might exceed the policy limits. The record also reflects that Wallis never met face-to-face with insured to go over the circumstances of the accident, although he did talk with insured by telephone concerning it. Although Wallis reviewed the police report of the accident, he never spoke directly with the police that worked the accident, something which in this type of serious injury situation insurers' branch claims office procedure manual says should have been done.

¶ 7 Young employed lawyers on Smith's behalf relatively quickly after the accident. Wallis was informed by a letter dated February 9, 2000 from one of the attorneys, Ms. Burton, that Smith had retained counsel. At said time, the other attorney was Mr. Forbes, who acted as Burton's superior or supervisor, as Burton was a relatively new attorney, while Forbes was a more experienced lawyer.

¶ 8 In February 2000 Wallis had telephonic discussion with Burton. Although the trial record supports a reasonable finding the matter was not finally settled, he sent a check for the $10,000.00 policy limits and a release to her, which she had requested. Thus, early in the matter insurers offered the policy limits to settle the claim being made against insured. Basically, Wallis testified he orally settled the case with Burton, but she denied the case was so settled. There is no question, however, settlement negotiation(s) and/or discussions took place between Wallis and Burton. There was also sufficient evidence presented to the jury to show that prior to the time the settlement check and release were sent by Wallis to Burton, Wallis knew or should have known the claim against insured was one of probable liability (even though Smith might have been in some percentage negligent) and that it was pretty much certain Smith's damages greatly exceeded the $10,000.00 policy limits.

¶ 9 After receiving the check and release, Burton and Forbes discussed the matter and decision was made that it would be a mistake to then recommend to Young that the release be signed, without conducting further investigation into whether there might be an employer or some other person or entity to pursue in the matter, in addition to insured. In an effort to pursue said investigation Burton, by letter dated March 3, 2000 to Wallis (and apparently telephonically), requested they be allowed to take insured's statement. The letter informed that insured had refused to speak to them by telephone; they would rather not force him to give a statement by filing suit against him and requiring a deposition when it was likely he would have little information of value; and they could not have the release signed without doing an investigation. The letter was received by insurers about March 6–7, 2000.

¶ 10 In effect, although there was no concrete thought or view by anyone involved (i.e., Wallis or Smith's lawyers) that insured had been drinking alcohol prior to the accident, Smith's attorneys had learned that one or more witnesses to the accident believed they observed insured squealing his tires while turning right after stopping at a red light immediately prior to striking Smith with his truck. Apparently, even though the police report did not so indicate, the lawyers were suspicious that insured might have been drinking and they wanted to make sure that no other person or entity existed that might

have some liability to Smith (e.g., a tavern if insured had been drinking). They also wanted to make sure he was not on a work-related errand in order to rule out the availability of potential liability or insurance from that source, i.e., insured's employer.

¶ 11 The evidence also supports a reasonable finding the request for insured's statement, or something in lieu thereof from him, was a reasonable request. In order to guard against a potential attorney malpractice claim, Smith's attorneys were of the view they could not rely solely on assurances from Wallis to the effect insured was merely on a personal errand and no other insurance or potential tortfeasor existed. Their view was they had to conduct sufficient investigation into these matters, particularly in light of the catastrophic injuries to Smith and the minimal policy limits of insured. Although the attorneys wanted to make sure of these matters, i.e., that insured was merely on a personal errand, that there was no other insurance and no other person or entity that might potentially be legally liable or responsible for Smith's injuries, the facts seem to be that insured was not working at the time of the accident, he had not been drinking before it and he was merely on a personal/family-related errand after he had gotten off work for the day, to wit: to purchase milk or bread at a store. Thus, no other insurance or potentially liable party exists or existed other than the $10,000.00 liability policy and insured, respectively.

¶ 12 Wallis, after conferring with a supervisor, but without consulting insured as to the statement request, refused the request. A March 16, 2000 statement-refusal letter on Farmers Insurance Group of Companies' letterhead signed by Wallis as Senior Claims Representative, Farmers Insurance Company, Inc. was sent to Burton.[4] The letter also stated that if Burton no longer wished to settle as agreed, she should return the settlement check to insurers. The evidence submitted to the jury indicates insurers never informed insured his statement was requested prior to the time suit was filed against him by Young, on Smith's behalf. Wallis, although testifying he did not believe insured

had been drinking at the time of the accident, basically testified his refusal to produce insured for a statement was an attempt to protect insured from potential criminal exposure or punitive damage exposure and, in effect, he was trying to protect insured from having to give a statement to opposing attorneys. Of course, just as the letter from Burton had previously indicated, once suit was filed insured was subject to being deposed as a party litigant to the lawsuit. If that course was followed, however, additional expenses associated with filing suit and the deposition would have potentially reduced the amount available to Smith as recompense for her injuries.

¶ 13 Prior to the sending of the March 16th letter, Wallis knew Smith had been seriously injured; that she had already incurred over $100,000.00 in medical bills; and he had formed the opinion that insured's liability was clear (although there might be some percentage of negligence on Smith's part). In fact, Wallis appears to have formed this opinion as early as February 8, 2000. Further, our review of the evidence convinces us a reasonable finding would be warranted that Burton and Forbes were amenable to recommending settlement of the matter for the $10,000.00 policy limits, if convinced no other insurance or tortfeasor (other than the MCIC policy or insured) was available. Though Wallis basically testified he thought the case would still settle for the policy limits at the time he prepared and sent the March 16th letter, the trial record contains evidence supportive of a reasonable finding Wallis knew or should have known suit would be filed against insured if something was not worked out concerning insured's statement. Additionally, the trial record contains evidence supportive of a reasonable finding Wallis knew or should have known that if suit was filed and not settled, a high probability existed a large excess verdict/judgment would be entered against insured in any trial, i.e., one far in excess of the policy limits.

¶ 14 After receiving the March 16th statement-refusal letter, Forbes/Burton referred

4. Farmers Insurance Company, Inc. is apparently another company under the umbrella of Farm-
ers Insurance Group of Companies.

the Smith case to Mr. Berry for litigation. Berry tried to persuade Wallis, via telephone call of April 17, 2000, to produce insured for a statement, but was unable to do so and a negligence action against insured was filed later that same day. Though during the call Wallis said something along the lines he would check around and get back to Berry concerning the statement request, Berry testified, in effect, it was his view of the conversation it was fairly clear Wallis had no intention of producing insured without a lawsuit being filed. Evidence submitted at trial indicated Berry told Wallis in the call if insured was not produced for a statement prior to a lawsuit being filed that Berry, in effect, would not settle or recommend settlement for the $10,000.00 policy limit, i.e., the matter would be fully pursued for as large a judgment as possible against insured. However, as with Burton and Forbes, a review of the evidence supports a reasonable finding that Berry was amenable to recommending settlement of the matter for the $10,000.00 policy limits if convinced no other insurance or tortfeasor (other than the MCIC policy or insured) was available, until he became convinced through the April 17th telephone call with Wallis that no opportunity for insured's statement would be afforded without a lawsuit being filed against insured.

¶ 15 Only after the Wallis/Berry call did Wallis, on April 17th, seek legal guidance from counsel concerning the statement issue. He testified he called a lawyer with insurers and sent him a letter leaving the matter of the statement up to said attorney. The letter appears not to have gotten to this attorney and seems to have been placed in the insurers' branch claims office file which had been closed contemporaneously with or shortly after the $10,000.00 check and release had been sent to Burton in late February 2000. Evidence submitted at trial, direct and/or inferential, supports a reasonable finding that legal guidance as to the statement request was necessary prior to the Berry telephone call, i.e., at a time close to receipt of the statement request letter from Burton.

¶ 16 Approximately forty (40) days elapsed from the first request for the statement and the Wallis/Berry telephone call. Evidence submitted at trial reasonably supports a finding neither Wallis nor anyone else with insurers, during said forty (40) days, did anything along the lines of trying to negotiate with the Smith lawyers to see if there were any acceptable alternatives short of or in lieu of a face-to-face statement from insured, e.g., an affidavit.

¶ 17 The record contains a power of attorney from Smith to her sister signed with an "X" and dated March 17, 2000. Neither Smith nor Young testified at trial. However, one or more of the Smith lawyers testified at trial, in effect, that had insured been produced for a statement and they were convinced he had no other assets, or limited assets (other than the insurance policy), to satisfy the large claim being made against him by Smith, and that no other insurance or tortfeasor existed to pursue in the matter, they would have advised Young and/or Smith to settle for the $10,000.00 policy limits and that no lawsuit would have been filed against insured. Insured testified that had he known Smith's lawyers wanted to talk with him about the accident, he would have been happy to talk with them.

¶ 18 Insured presented an expert witness [Ms. Luther—a licensed insurance adjuster for about twenty-one (21) years] who basically labeled the Smith claim against insured as a code blue situation and that Wallis and insurers did not treat it as such. A code blue situation was described as one involving probable liability, catastrophic injuries and minimum coverage. It was also essentially described as one where insured's financial life was at stake because of the potential for large exposure over the $10,000.00 policy limits.

¶ 19 After suit was filed against insured on April 17th, insurers provided him legal counsel at insurers' expense. Smith obtained a $1,000,000.00 jury verdict which was reduced by 40%, the percentage of negligence the jury attributed to her. The total judgment against insured was $633,202.63, which consisted of $600,000.00 (i.e., $1,000,000.00 × 60%) plus $33,202.63, the latter amount apparently prejudgment interest on the $600,000.00. Some time after the excess ver-

dict, insurers again tendered the policy limits to Smith, which was accepted, reducing the judgment against insured by $10,000.00.

¶ 20 Insured did not have sufficient income or assets to satisfy the Smith judgment. He is married, has three children, lives in a modest home and makes about eight dollars and fifty cents ($8.50) per hour. Insured received legal advice concerning his options relating to the potential for filing bankruptcy or pursuing a claim against insurers for breach of the duty of good faith and fair dealing, in essence, in relation to the handling of the matter prior to suit being filed against him. He chose the latter.

¶ 21 Insured reached an agreement with Smith to stay any attempt to execute or seek recovery on her judgment pending the outcome of this suit against insurers. The agreement contemplates creation of a fund comprised of any monies paid to insured by insurers as a result of this litigation. After payment of attorney fees, the balance of the fund is to be applied to satisfy Smith's judgment with any remaining balance to be paid to insured.

¶ 22 The instant case was tried to a jury. At the close of insured's evidence, insurers moved for a directed verdict on the claim of breach of the duty of good faith and fair dealing and on insured's claim for punitive damages. The trial court refused to direct a verdict on the former, but did direct a verdict for insurers on the latter, finding no evidence of reckless disregard or malice by insurers. The jury returned a general verdict of $2,200,000.00 for insured's financial losses, embarrassment, and mental pain and suffering. The trial court entered judgment on the jury verdict, but denied insured's post-trial quests for attorney fees and prejudgment interest.

¶ 23 At the trial of this matter, stated very generally, insurers' primary defense was that one or more of the Young-hired attorneys had no genuine intention of really attempting to settle the Smith claim for the $10,000.00 policy limit, but, instead, were engaged in a plan or scheme to set up insurers, i.e., they were attempting to manufacture a claim against insurers for breach of the duty of good faith and fair dealing. On appeal, in-

surers challenge the trial court's refusal to direct a verdict on the claim of breach of the duty of good faith and fair dealing and the trial court's failure to direct a verdict for FIE based on the argument it was not the insurer. Alternatively, insurers seek reversal and a new trial due to the trial court's exclusion of evidence concerning Smith's capacity during the period of time the Young-hired lawyers were dealing with insurers prior to filing a lawsuit against insured and based on other claimed trial court errors. Via his counter-appeal, insured challenges the trial court's directed verdict to insurers as to punitive damages. He also asserts trial court error in denying his quests for attorney fees and prejudgment interest.

## INSURERS' APPEAL.

## PART III. THE TRIAL COURT DID NOT ERR IN DECLINING TO DIRECT A VERDICT FOR INSURERS AS TO IN-SURED'S CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING.

¶ 24 Insurers challenge denial of their motion(s) for directed verdict on insured's claim for breach of the duty of good faith and fair dealing. A denial of a motion for directed verdict is reviewed *de novo*. *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 6, 49 P.3d 732, 735. In *Gillham v. Lake Country Raceway*, 2001 OK 41, 24 P.3d 858, the basic test as to when it is appropriate to sustain a motion for directed verdict is set forth. There it is stated:

A motion for directed verdict raises the question of whether there is any evidence to support a judgment for the party against whom the motion is made, and the trial court must consider as true all the evidence and inferences reasonably drawn therefrom favorable to the non-movant, and disregard any evidence which favors the movant. A demurrer to the evidence or motion for directed verdict should be granted only if the party opposing the motion has failed to demonstrate a prima facie case for recovery.

2001 OK 41, at ¶ 7, 24 P.3d at 860. (citations omitted). When reviewing a trial court's rulings on a directed verdict we also view the

evidence and the reasonable inferences therefrom in favor of the non-movant. *See id.*

■ ¶ 25 The essential elements insured was required to show to make out a prima facie case were as follows: 1) he was covered under the automobile liability insurance policy issued by MCIC and that insurers were required to take reasonable actions in handling the Smith claim; 2) the actions of insurers were unreasonable under the circumstances; 3) insurers failed to deal fairly and act in good faith toward him in their handling of the Smith claim; and 4) the breach or violation of the duty of good faith and fair dealing was the direct cause of any damages sustained by insured. *See* OUJI—Civ (2d) 22.3. In one form or another insurers posit a failure of sufficient proof for jury submission as to the unreasonableness of their conduct, as to breach of their duty of good faith and fair dealing and as to whether any breach on their part could rightfully be considered the direct or proximate cause of insured's damages.[5] We hold the trial court correctly decided proof was presented as to each element sufficient to warrant submission to the jury for its consideration.

## A. UNREASONABLENESS AND BREACH.

■ ¶ 26 An insurer has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received." *Christian v. American Home Assurance Co.,* 1977 OK 141, 577 P.2d 899, 901. "An insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed." *Newport v. USAA,* 2000 OK 59, ¶ 15, 11 P.3d 190, 196. In dealing with third parties, however, the insured's interests must be given faithful consideration and the insurer must treat a claim being made by a third party against its insured's liability policy "as if the insurer alone were liable for the entire amount" of the claim. *See American Fidelity & Casualty Co. v. L.C. Jones Trucking Co.,* 1957 OK 287, 321 P.2d 685, 687.

¶ 27 In other words, insurers were required to approach settlement as if the $10,000.00 policy limits did not exist and to ignore the policy limits during settlement negotiations. *See Berglund v. State Farm Mutual Auto. Ins. Co.,* 121 F.3d 1225, 1227–1228 (8th Cir.1997). The reason for the rule is that an insurance company, in dealing with a third-party claim against its insured, is acting in a fiduciary capacity toward its insured by virtue of the terms of the insurance policy which give the insurer the authority to determine whether an offer of compromise or settlement should be accepted or rejected [*American Fidelity & Casualty Co. v. G.A. Nichols Co.,* 173 F.2d 830, 832 (10th Cir. 1949)], or the insurer is acting as an agent of the insured, the carrier being in control of disposition of the claim. *See American Fidelity & Casualty Co. v. L.C. Jones Trucking Co.,* 321 P.2d at 687.

■ ¶ 28 The essence of an action for breach of the duty of good faith and fair dealing "is the insurer's unreasonable, bad-faith conduct ... and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, 637 P.2d 583, 587.[6] A central issue in any analysis to determine whether breach has occurred is

---

**5.** FIE also asserts it cannot be held liable, in any event, because insured did not sufficiently show it was the insurer. It challenges the trial court's denial of its directed verdict quest on such issue. We deal with FIE's contention in such regard in **PART V,** *infra.*

**6.** In *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, 637 P.2d 583, 587, the Court referred to the tort at issue as "the intentional tort of bad faith," the phrase, in our view, being used as a short hand reference for the tortious conduct consisting of breach of the duty of good faith and fair dealing. Regardless of why the phrase was used there (or other cases), we make it plain at this time that use of the language, "the intentional tort of bad faith," is not meant to convey that in order to recover for breach of the duty of good faith and fair dealing, an insured must prove the insurer intended to harm or deceive its insured. Breach of the duty may be shown without proving conduct on the part of an insurer that was intended to harm, injure or deceive its insured.

gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing. *See Buzzard v. McDanel,* 1987 OK 28, 736 P.2d 157, 159. To the extent *American Fidelity & Casualty Co. v. L.C. Jones Trucking Co.,* 321 P.2d at 687, may have implied that a simple negligence standard was approved or adopted as to the level of culpability necessary to be shown for liability to attach to an insurer for breach of the duty of good faith and fair dealing in relation to the handling of a third-party claim made against the insured, i.e., the situation involved here, that case is expressly overruled, but only to such extent.[7] In our view, under *Christian* and later cases, the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer. In **PART VII,** *infra,* we discuss the minimum level of culpability necessary to warrant a punitive damage recovery against an insurer for breach of the duty of good faith and fair dealing.

¶ 29 Insurers argue here they cannot be held liable for breach of the duty of good faith and fair dealing because they tendered the policy limits and never received an unconditional settlement offer from Smith's attorneys. Put another way, insurers assert insured had to show the third party (i.e., Smith or her representatives) made an unconditional offer to settle within policy limits and insurers refused the offer; i.e., that liability for a failure to settle within policy limits always requires that the insurer received an unconditional settlement offer from the third-party claimant and that the unconditional offer was refused. Insurers allege the absence of either an unconditional settlement offer or an insurer's refusal to pay policy limits defeats an insured's claim for breach of the duty of good faith and fair dealing. We have been unable to unearth

any Oklahoma decision that has held the mere tender of policy limits to a third-party claimant and/or the lack of an unconditional settlement offer from the third party, will always be sufficient to defeat an insured's claim for breach of the duty of good faith and fair dealing and, in effect, relieve an insurer of compliance with its duty to safeguard the interests of its insured, **irrespective of other salient circumstances or considerations.**

 ¶ 30 Although during settlement negotiations or discussions with Smith's attorneys, insurers, of course, had no duty to actually offer or pay, with their money, more than the limits of the policy, evidence submitted is sufficient to support a reasonable finding insurers did not approach the matter or make decisions concerning it, as if they alone were responsible for the entire amount of the claim being made by Smith. Evidence exists to show insurers did little, if anything, between the time of the statement request and the Berry/Wallis telephone call to work out some alternative, e.g., an affidavit, in lieu of a face-to-face statement encounter with Smith's lawyers. Instead of trying to work something out, Wallis sent the statement-refusal letter telling Burton to send back the $10,000.00 policy limits check if she no longer wished to settle, a settlement she denied having ever entered into. Rather than only involving offering the policy limits or responding to unconditional settlement offers, the duty of good faith and fair dealing in this third party situation required insurers to reasonably respond to reasonable requests from Smith's lawyers in an effort to settle the case for the protection of their insured, the person whose financial life or health was hanging in the balance. Whether they did so, in our view, was for the jury to consider, a consideration that could include asking the question, would someone whose own financial health or life was at stake have acted in the manner that insurers did?

¶ 31 The statement request also implicated the extent to which insurers were required to

---

7. In the body of the opinion in *American Fidelity & Casualty Co. v. L.C. Jones Trucking Co.,* 1957 OK 287, 321 P.2d 685, 687, the Court appears to approve a negligence standard with respect to an insurer's handling of third-party claims made against the insured, although liability based on only simple negligence is **not** approved or adopted in either of the two syllabi contained in that case. *Id.* at 686.

**1095**

consult, communicate with and inform their insured regarding that request and its potential impact on settlement negotiations/discussions insurers were involved in, as it was insured's assets and his potential bankruptcy (i.e., his financial future) at issue if the matter did not settle for the policy limits. Surely, a rational jury could conclude based on the evidence that insurers failed in their communicative/consultative duty. A rational jury could also conclude that insured was entitled to reasonable information concerning the statement request and settlement implications thereof in order for him to have necessary input concerning the request so that an informed decision as to how best to respond could be formulated, giving due consideration to his input and desires in such regard. In that it was insured's financial health implicated above the $10,000.00 policy limits, it could be found it was incumbent on insurers to consult with him on the matter.

¶ 32 A central question here is whether someone who was on a personal errand, who was not drinking and who clearly did not have assets or the financial wherewithal to satisfy the claim being made by Smith (in light of her extensive injuries and medical bills), would have acquiesced in a statement or taken affirmative steps to attempt to work out some solution with Smith's lawyers in lieu of such a statement, rather than following the course insurers followed. We believe a rational juror could view insurers' conduct as almost daring Smith's lawyers to file suit against insured, without even informing him a statement (or something in lieu thereof) might result in a quick settlement of the matter within the policy limits. Such act(s) and/or omission(s) of insurers were sufficient to create jury questions as to the reasonableness of insurers' conduct and as to breach of the duty of good faith and fair dealing.

¶ 33 Contrary to insurers' position(s), a carrier's duty of good faith and fair dealing in the situation reasonably shown by this record involves more than making an offer to settle for or within policy limits, or simply not refusing unconditional settlement offers within those limits. It has even been held, if an insured's liability is clear and the injuries of a claimant are so severe that a judgment in excess of policy limits is likely, the insurer has an affirmative duty to initiate settlement negotiations. *Powell v. Prudential Property & Casualty Ins. Co.,* 584 So.2d 12, 14 (Fla. App. 3rd Dist.1991), *review denied,* 598 So.2d 77 (Fla.1992). In the instant case, regardless of who initiated settlement discussions/negotiations, part of same involved what rational jurors could find was a reasonable request for insured's statement. Although liability might well be defeated when a condition or request by a third-party claimant may **only** rationally be considered an unreasonable one from the perspective of the insured and, possibly, even from the insurer's perspective depending on the particular circumstances, the same cannot be said when the condition or request is reasonable or may properly be found such by the trier of fact, and the insurer's unreasonable response to it inures to the detriment of its own insured in violation of the duty of good faith and fair dealing.

¶ 34 Also, a legally binding, unconditional offer of settlement from the claimant is not a prerequisite to maintaining an action of this type where the insured has been exposed to an excess verdict. *Alt v. American Family Mutual Ins. Co.,* 71 Wis.2d 340, 237 N.W.2d 706, 709 (1976). In the circumstances here, insurers could be found to have had an affirmative duty to seize a reasonable opportunity to protect insured from the potential for excess liability and their duty consisted of more than merely playing a passive role in the settlement process. *See Alt,* 237 N.W.2d at 713. To us, this appears certainly true when, as here, the lawyers acting on behalf of Smith expressed a willingness to consider settlement within the policy limits. *See id.* at 712–713.

¶ 35 It has also been recognized that an insurance company's decisions regarding settlement must be made based on a thorough investigation of the underlying circumstances of the claim and on informed interaction with the insured. *Mowry v. Badger State Mutual Casualty Co.,* 129 Wis.2d 496, 385 N.W.2d 171, 178 (1986). The duty of an insurance company in this type of situation includes the duty of timely and adequately informing insured of the progress of settlement negotiations. *Baker v. Northwestern*

*National Cas. Co.,* 22 Wis.2d 77, 125 N.W.2d 370, 373 (1963). Here, that would include timely and adequately informing insured of the statement request, particularly given its importance as to settlement probability within the policy limits.

¶ 36 In this third-party-type situation, an insurer's duty of good faith and fair dealing includes the duty to act in a diligent manner in relation to investigation, negotiation, defense and settlement of claims being made against the insured. *See State Automobile Ins. Co. v. Rowland,* 221 Tenn. 421, 427 S.W.2d 30, 33 (1968). "The duty to inform the insured of settlement opportunities is one of the duties subsumed within the duty of good faith owed by an insurer to an insured." *Berges v. Infinity Ins. Co.,* 896 So.2d 665, 680 (Fla.2004). Although failure to so inform does not automatically establish breach of the duty of good faith and fair dealing, it is one factor the jury may consider in deciding whether the insurer acted in violation of the duty of good faith and fair dealing. *Id.* The settlement opportunity in the instant case was tied to the statement request and, of course, that request, along with the potential for settlement if it was given, is what could reasonably have been found necessary to be relayed to and discussed with insured. In the final analysis, we believe sufficient evidence as to unreasonableness and breach of the duty of good faith and fair dealing by insurers is contained in the trial record such that these elements were properly supported and properly submitted to the jury for its consideration.

**B. DIRECT OR PROXIMATE CAUSE:**

¶ 37 As to their challenge relating to causation, insurers argue, in effect, no causation could be found unless Smith herself testified she could and would have settled her claim or that she authorized someone else who would have done so, said authorization being made at a time Smith unequivocally had the capacity to so authorize. We do not believe the failure of Smith to testify at trial provides insurers with an absolute shield on the proximate or direct cause element of insured's claim. Initially, we begin our analysis with the recognition that, unless there is

no competent evidence from which a jury could reasonably find a causal nexus between the act(s) or omission(s) deemed tortious and the injury, the question of proximate cause is for the jury. *Gillham v. Lake Country Raceway,* 2001 OK 41, ¶ 7, 24 P.3d 858, 860.

¶ 38 Insurers' argument(s) as to causation, capacity and authorization seek to take advantage of Smith's purported incapacity (as a result of her injuries from the accident and treatment received) from the date of the accident to, at the latest, April 17, 2000, when suit was filed against insured by Young on Smith's behalf. Although we agree it is the client that must decide whether to settle a case, or afford someone else the authority to do so on her behalf, and the general rule is that an attorney has no power or authority to compromise or settle a case without appropriate authority from the client [*See Walker v. Gulf Pipe Line Co.,* 1924 OK 515, 226 P. 1046 (First Syllabus by the Court) ], we believe the instant trial record contains sufficient evidence to support a rational finding it was the unreasonable acts and/or omissions of insurers in breach of their duty of good faith and fair dealing toward insured that caused a lost opportunity to settle the matter within the $10,000.00 policy limits. This is so, even though Smith did not testify at the trial of this matter.

¶ 39 In effect, one or more of the attorneys for Smith testified they would have recommended settlement within the policy limits had a statement been given and they were convinced insured had no other assets, or limited assets (other than the insurance policy), to satisfy the large claim existent, and no other insurance or tortfeasor was available. To us, the jury was allowed to consider this testimony, reasonable inferences from other evidence submitted at trial and to use common sense to reach a reasoned decision that it was more probable than not the matter would have settled for the $10,000.00 policy limits were it not for unreasonable acts and/or omissions of insurers in violation of the duty of good faith and fair dealing.[8]

¶ 40 It has also been recognized the basic purpose of the rule that a contract (a settlement agreement is one type of contract)

8. Insured was required to prove the essential

elements of his claim for breach of the duty of

may be avoided by virtue of the incapacity of one of the makers thereof is for protection of the incompetent. *Davidson v. National Aid Life Ass'n*, 1935 OK 922, 50 P.2d 173, 175. It is also quite plain that a client may later ratify a settlement agreement reached by his/her attorney under appropriate circumstances. *Yahola Sand & Gravel Co. v. Marx*, 1960 OK 206, 358 P.2d 366. Any settlement reached by Young on Smith's behalf by virtue of the former's authorization under the power of attorney, could further have been made subject to court approval had insurers been concerned about the capacity of Smith during the relevant time period. Very simply, in our view, the absence of testimony from Smith did not mandate a directed verdict in favor of insurers because of a lack of proof on the causation element.[9] Thus, the question of whether insurers caused a lost opportunity to settle Smith's claim within the $10,000.00 policy limits was an issue properly left for the jury to decide.

¶ 41 In sum, sufficient evidence was presented from which the jury could properly conclude insurers engaged in unreasonable conduct, breached the duty of good faith and fair dealing owed to insured and directly/proximately caused insured recoverable damages. The trial court did not err in submitting insured's claim against insurers for actual damages to the jury.

## PART IV. EXCLUSION OF EVIDENCE CONCERNING SMITH'S CAPACITY DOES NOT WARRANT REVERSAL OR REQUIRE A NEW TRIAL.[10]

■ ¶ 42 Insurers claim entitlement to a new trial due to the trial court's exclusion of evidence concerning Smith's capacity during the period of time the Young-hired lawyers were dealing with insurers prior to filing a lawsuit against insured.[11] As generally alluded to in **PART III** above, at least part of insurers' defense to insured's suit was the assertion no opportunity to settle the Smith claim was actually lost, as Smith was incapacitated during the relevant time period and that she could, thus, not have validly executed a power of attorney to Young or have agreed to settle the case herself during such time period, and it was, therefore, not any act or omission on their part that proximately caused any failure to so settle. Tied to the incapacity argument is insurers' position that the attorneys hired by Young had no authority to act on Smith's behalf, one or more of said lawyers engaged in a set-up of insurers

good faith and fair dealing by a greater weight of the evidence standard, i.e., by a preponderance of the evidence. "As the well-known axiom states, the preponderance of the evidence does not mean the greater number of witnesses testifying to a fact, but means that which, to the mind of the trier of the fact, or the seeker of the truth, seems most convincing and more probably true." *Peyton v. McCaslin*, 1966 OK 4, 417 P.2d 316, 321–322.

9. Of course, insurers were free to call Smith to inquire as to whether she would have sought to rescind or avoid any settlement reached by Young on her behalf under the power of attorney for the policy limits. Insurers did not attempt to do so.

10. Insurers also argue we should review the trial court's denial of MCIC's motion for summary judgment on the issue of Smith's incapacity, the consequent assertion her incapacity showed no actual settlement opportunity existed during the relevant time period and, thus, any failure of settlement within policy limits was not directly or proximately caused by conduct of insurers in handling Smith's claim. The denial of summary judgment as to such issue may not be reviewed at this stage because this case was tried to a jury and judgment has entered on the jury's verdict.

See *Myers v. Missouri Pacific Railroad Co.*, 2002 OK 60, ¶ 39, 52 P.3d 1014, 1034. If reversible error exists as to this capacity/no settlement opportunity/causation issue, it must be predicated on what occurred at trial—including preserved evidentiary rulings made by the trial court at trial which have been appealed by insurers—not on the trial court's pretrial ruling denying summary judgment on the issue. Also, had reversible error been so shown as to some evidentiary ruling made at trial (which we believe has not been so shown), review of the summary judgment denial would not be insurers' due, but remand for new trial would be the appropriate remedy in normal circumstances. One of the cases relied on by insurers in support of their argument that we should now review the denial of summary judgment on the issue, seems to make this latter point clear. See *SCS/Compute, Inc. v. Meredith*, 1993 OK CIV APP 124, 864 P.2d 1292, 1294–1295.

11. Insurers sought to present one or more medical witnesses who had cared for Smith during her hospitalization to testify, essentially, she was not competent to have authorized the power of attorney to Young due to her injuries and/or medication administered to her at the time. They also sought to question other witnesses concerning the capacity/authorization issue.

and the lawyer(s) really never had any intention of attempting to settle the case for policy limits. Insurers also argue evidence concerning Smith's alleged incapacity was admissible as relevant to the bias, motive and credibility of Burton, Forbes and Berry. As we understand their argument in this latter regard, it is that Smith's incapacity and what insurers characterize as the machinations the three attorneys and Young went through to create some semblance of authority in themselves to act on Smith's behalf, had relevance to their bias, motive and credibility, i.e., the evidence would have further supported the set-up defense.

¶ 43 Although the trial judge generally excluded evidence sought to be submitted on behalf of insurers concerning Smith's capacity or lack thereof based on the view insurers did not rely on any lack of capacity on Smith's part to justify any of their conduct relating to any discussions with the Young-hired attorneys concerning settlement or the statement request during the time frame those discussions actually occurred, the trial judge allowed extensive evidence in support of insurers' set-up defense. For example, evidence was presented to the jury that the power of attorney was not validly notarized; that neither Burton, Forbes nor Berry had actually spoken with Smith prior to April 17th; and that suit against insured was contemplated even before the statement request was made. There was also evidence submitted that Smith was in a semi-comatose state, at least, through on or about March 28, 2000.

¶ 44 We first note that insurers do not argue that Smith's asserted incapacity had anything to do with their refusal to provide insured for a statement and they do not claim Smith's purported incapacity may be used by them to excuse any unreasonable conduct on their part or any breach of the implied duty of good faith and fair dealing. Instead, as we understand their position, it is that the lack of capacity defense was relevant as to the essential element of causation and as to the bias, motive and credibility of the attorneys.

¶ 45 The trial court's exclusion of evidence concerning Smith's capacity is plainly consistent with *Buzzard v. Farmers Ins. Co., Inc.,* 1991 OK 127, 824 P.2d 1105, 1109

and *Newport v. USAA,* 2000 OK 59, ¶¶ 34–37, 11 P.3d 190, 199–200, to the extent evidence of capacity or lack of authorization on the part of the Young-hired attorneys to act on Smith's behalf, would tend to excuse any unreasonable conduct on insurers' part or any breach by insurers of their duty of good faith and fair dealing toward insured. When presented with a claim, an insurer "must conduct an investigation reasonably appropriate under the circumstances. The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d at 1109. Nothing indicates insurers considered Smith's purported lack of capacity to execute a power of attorney or to agree to a settlement at the time the matter was being reviewed by them. Nor was any alleged lack of capacity or authorization raised by insurers as some type of obstacle in settlement negotiations/discussions with the attorneys that were acting on her behalf, nor as somehow sustaining the reasonableness of insurers' handling of the statement request or the ultimate decision not to produce insured for a statement without consulting him on the matter.

¶ 46 As to causation, even assuming *Buzzard v. Farmers Ins. Co., Inc.* and *Newport* would not render correct the trial court's ruling generally excluding evidence concerning Smith's capacity or lack thereof during the relevant time period, we believe no reversible error has been shown by insurers in any event; rather, any error was at most harmless. Title 12 O.S.2001, § 2104(A) provides, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected[.]" Title 12 O.S.2001, § 78 states, "[t]he court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

¶ 47 A judgment is not subject to reversal for error in the rejection of evidence unless it appears from review of the whole record that the "error has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or

statutory right." *Samara v. State ex rel. Oklahoma Capitol Improvement Authority,* 1964 OK 79, 398 P.2d 89, 90 (Third Syllabus by the Court), *appeal dismissed* and *cert. denied,* 381 U.S. 354, 85 S.Ct. 1556, 14 L.Ed.2d 681 (1965); *see also Bates v. Utech,* 1967 OK 256, 441 P.2d 952, 953 (Second Syllabus by the Court). In other words, not every erroneous exclusion of evidence is deemed reversible error; instead, some errors are deemed harmless. When it is probable a verdict would have been unchanged even had the rejected evidence been admitted, this Court is not warranted in reversing the cause based on the erroneous exclusion. *See Layton v. Purcell,* 1954 OK 38, 267 P.2d 547, 554 (to be reversible complaining party must show alleged errors were prejudicial and it must appear verdict and judgment would probably have been different had errors not occurred); 2 LEO H. WHINERY, OKLAHOMA EVIDENCE, COMMENTARY ON THE LAW OF EVIDENCE 239–242, § 11.15 (2nd ed.2000). In our view, insurers have not shown reversible error as to the exclusion of evidence concerning Smith's capacity or lack thereof that would warrant remand for a new trial.

¶ 48 In essence, insurers are trying to take advantage of the rule that provides a contract entered by a person lacking capacity is avoidable and subject to rescission. As noted in **PART III(B)**, the basic purpose of the rule a contract may be avoided by reason of incapacity of one of the makers thereof is for protection of the incompetent. *See Davidson v. National Aid Life Ass'n,* 1935 OK 922, 50 P.2d 173, 175. Had a settlement for the $10,000.00 policy limits been reached with Young on Smith's behalf, or some type of tentative settlement agreement been entered which might have been subject to being later approved or ratified by Smith, or that might have been subject to court approval if that was deemed necessary in view of her condition, it was Smith who would have been in the position to complain by attempting to rescind or avoid any said settlement. It seems to us bordering on the nonsensical to conclude either insurers or insured would have been in a position to complain about it and claim harm thereby, particularly in light of the serious nature of the injuries to Smith, the extensive medical bills she had incurred, and insurers' early evaluation that insured's liability was likely.[12] Thus, even had it been conclusively shown that Smith was incapacitated during relevant time periods this would not have doomed any settlement reached on her behalf prior to April 17th, nor would it have provided insurers the absolute defense they seek on causation.

¶ 49 Further, our review of the trial record shows insurers were allowed to present extensively for the jury's consideration their set-up defense in an attempt to show the lawyers hired by Young never really had an intention to settle or recommend settlement within the $10,000.00 policy limits. Evidence was allowed as to whether it was refusal to produce insured for a statement that caused the opportunity for settlement within the policy limits to be lost or, instead, whether it was a set-up by the Young/Smith attorneys that caused the lost opportunity and consequent excess verdict against insured and other recoverable damages. Evidence was also admitted that only the client (not the attorney) could authorize settlement and evidence came before the jury that Smith was in a semi-comatose state at least through March 28, 2000. Insurers were also allowed to explore the bias, motive and credibility of the attorneys and to argue the set-up defense in their closing arguments to the jury.

¶ 50 Thus, the jury was assigned the task of determining whether the opportunity for settlement failed due to the actions of the insurers or whether it failed because the requests of Smith's lawyers for a statement were unreasonable and part of an overall plan designed to set-up insurers at a time said attorneys had no real intent to ever consider settling the matter or recommending to their client(s) settling the matter and releasing insured for only the $10,000.00 policy limits. In light of the fact extensive evidence concerning insurers' set-up defense was allowed, in our view, insurers have failed to show any miscarriage of justice or a sub-

12. Although there might be some situations where the party to an agreement who is not the one claimed to have been incapacitated at the time of its making may legitimately seek to rescind or avoid it, we fail to see the applicability of any such situation in the circumstances of this case.

stantial violation of some constitutional or statutory right warranting reversal and a new trial. We also believe they have not adequately shown any exclusion of the capacity evidence they sought to introduce was prejudicial nor that the verdict and judgment in favor of insured would probably have been different had such evidence been admitted. In sum, we do not believe the proffer of additional evidence concerning Smith's capacity would have materially affected the outcome of the case and no finding of reversible error is warranted.[13]

**13.** Insurers also assert on appeal trial court error in regard to failing to give certain jury instructions requested by insurers generally relating to the duty of good faith and fair dealing with respect to settlement offers from third-party claimants, and mental capacity and authority necessary to settle a claim. We have reviewed the instructions given by the trial court and the requested instructions offered by insurers which they assert should have been given. Although we do not believe we are required to consider the arguments concerning these requested jury instructions for the reason that neither of insurers' initial appellate briefs (April 8 and June 18, 2003—brief in chief, etc. and reply brief, etc., respectively) contain citation of authority concerning their claims of error in regard to them (See Okla. Sup.Ct. R. 1.11(k)(1), 12 O.S. Supp. 2004, Ch. 15, App. 1—"[a]rgument [in an appeal brief] without supporting authority will not be considered"), we examine the claims of error in any event. Although their briefs contain no citation of authority supporting said claim(s) of error, insurers have attached to an April 8, 2003 appendix, etc. submitted along with their brief in chief, etc. of the same date, the pertinent requested instructions, which do contain legal authority on them. We note, however, the citation of authority on requested instructions submitted to a trial court, said requested instructions later being made part of an appendix filed in this Court pursuant to Okla. Sup.Ct. R. 1.11(e)(1), is **not** sufficient to satisfy the requirement that argument in an appellate brief, in order to receive consideration by this Court (subject to limited exception), be supported by pertinent authority. Thus, although we consider insurers' claims of error here, such leniency on our part in the present case is not necessarily transferrable to other appeals pending in this Court or those to be filed in the future; a question, of course, we need not now decide.

This Court has stated the following general rules regarding claims of error as to jury instructions:

When reviewing jury instructions, the standard of review requires the consideration of the accuracy of the statement of law as well as the applicability of the instructions to the issues. The instructions are considered as a

## PART V. FIE WAS NOT ENTITLED TO A DIRECTED VERDICT BASED ON THE ASSERTION IT WAS NOT THE INSURER; INSTEAD, THE TRIAL COURT PROPERLY RULED AS A MATTER OF LAW THAT MCIC AND FIE SHOULD BE TREATED AS ONE ENTITY FOR PURPOSES OF POTENTIAL LIABILITY AS TO ANY BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING.

■■■■ ¶ 51 FIE also asserts the trial court erred in denying FIE's motion for directed verdict based on the argument that because whole. When the trial court submits a case to the jury under proper instructions on its fundamental issues and a judgment within the issues and supported by competent evidence is rendered in accord with the verdict, the judgment will not be reversed for refusal to give additional or more detailed instructions requested by the losing party, if it does not appear probable that the refusal has resulted in a miscarriage of justice or substantial violation of constitutional or statutory rights. A judgment will not be disturbed because of allegedly erroneous instructions, unless it appears reasonably certain that the jury was misled thereby. The test of reversible error in instructions is whether the jury was misled to the extent of rendering a different verdict than it would have rendered, if the alleged errors had not occurred. *Johnson v. Ford Motor Co.*, 2002 OK 24, ¶ 16, 45 P.3d 86, 92–93. (footnotes omitted). In reviewing these types of instruction issues, consideration should be given to the instructions given, the issues raised and the instructions requested. *Id.*, 2002 OK 24, at ¶ 17, 45 P.3d at 93. Our review convinces us the instructions given adequately, fairly and substantially covered the pertinent issues and applicable law. We also do not believe insurers have shown juror confusion, any misleading of the jury nor that any refusal to give one or more of their requested instructions has resulted in a miscarriage of justice or substantial violation of their constitutional or statutory rights.

As to the specific instructions requested by insurers contained in their April 8, 2003 appendix, etc., we state the following: 1) requested instructions nos. 10 (refusal to settle) and 18 (Loretta Smith's capacity to contract) do not accurately state the law as delineated in this opinion; 2) requested instruction no. 11 (offer defined) was given to the jury by the trial court as instruction no. 11; 3) requested instructions nos. 13 and 14, basically setting forth that a settlement agreement and release, and a power of attorney, respectively, are all contracts, although stating truisms and, thus, being legally correct in the abstract, were not required to be given; 4) requested instructions nos. 15 (authority to settle), 16 (authority of agent) and 17 (capacity to contract), although again seemingly set-

it was not a party to the insurance contract between MCIC and insured, i.e., because FIE was not the named insurer on the policy, it was not subject to liability or suit for breach of the duty of good faith ;and· fair dealing toward insured. In essence, FIE's argument is that as a non-insurer it had no duty of good faith and fair dealing toward insured that could be breached and, thus, it could not be held liable for the manner in which it handled the claim under insured's policy. In our view, the trial court did not err in denying FIE's motion for directed verdict as to such issue.

¶ 52 Although normally it is only the actual insurer that owes the duty of good faith and fair dealing to its insured (*Wathor v. Mutual Assurance Administrators, Inc.*, 2004 OK 2, ¶ 18, 87 P.3d 559, 562) and a cause for breach of the duty will not lie against a stranger to the insurance contract [*Timmons v. Royal Globe Ins. Co. (Timmons I )*, 1982 OK 97, 653 P.2d 907, 912–913], these normal rules are not absolutes; there are exceptions. When a non-party to the insurance contract, based on the specific facts and circumstances existent, engages in activities or conduct such that it may be found to be acting sufficiently like an insurer so that a special relationship can be said to exist between the entity and the insured, we have made it clear that imposition upon said entity of the same duty of good faith and fair dealing as that imposed on the actual insurer issuing the insurance policy is appropriate. *Wathor*, 2004 OK 2, at ¶ 16, 87 P.3d at 563–564.

¶ 53 Our *de novo* review of the trial record convinces us there was plainly sufficient evi-

dence submitted at the jury trial to warrant the trial court's decision to deny FIE's directed verdict quest as to said issue.· Although we do not deem it necessary to detail all the evidence, or inferences therefrom, relevant to the issue, evidence was presented that FIE employees handled the claim and adjusted the claim, that MCIC and FIE are affiliated companies, both under the umbrella of the Farmers Insurance Group of Companies, and that FIE and MCIC acted as one entity in regard to insured's policy relating to the Smith claim. Evidence submitted at trial adequately showed FIE acted sufficiently like an insurer so that a special relationship could be said to exist between it and insured in relation to the Smith claim. Thus, the trial court did not err in denying FIE's motion for a directed verdict based on FIE's argument it had no duty of good faith and fair dealing toward insured as a non-party to the insurance contract.

¶ 54 FIE also argues the trial court erred by, in effect, directing a verdict in favor of insured on the above issue, i.e., that in submitting the matter to the jury, MCIC and FIE, although each were identified in the instructions and verdict forms, were treated as one for purposes of liability for breach of the duty of good faith and fair dealing. Our review of the trial record convinces us that is precisely what the trial court did, i.e., it treated the two entities as one for purposes of liability and ruled as a matter of law that both MCIC and FIE owed insured a duty of good faith and fair dealing.[14] This does not, however, necessarily mean any error occurred.

ting forth correctly abstract principles of law, were also not required to be given; 5) requested instruction no. 20 (bad faith—damages)(mislabeled in insurers' April 8, 2003 appendix, etc. as requested instruction no. 2), was not required to be given instead of instruction no. 14 as given by the trial court concerning damages; and 6) requested instruction no. 9 (failure to deal fairly and act in good faith) was not required to be given instead of instruction no. 13, which was given by the trial court concerning the elements required to be shown by insured to recover damages for breach of the duty of good faith and fair dealing, said instruction no. 13 basically being taken from OUJI—Civ (2d) 22.3. The bottom line is that insurers' claims concerning instructions fail to show any reversible error.

14. At the instruction conference, insured (through counsel) requested the trial court to direct a verdict for him on this issue, i.e., to treat FIE and MCIC as one in regard to breach of the duty of good faith and fair dealing. Although the trial court did not expressly, in words, grant insured's quest in such regard, practically the request was granted because instructions requested by insurers generally concerning FIE's arguments based on the loaned servant doctrine and that FIE employees were acting solely on behalf of MCIC in regard to the Smith claim, were refused by the trial court. Under the instructions and verdict forms presented to the jury for consideration, although FIE and MCIC were each identified, the jury either had to exonerate both MCIC and FIE or find both liable. We

¶ 55 Our review of the record shows that such ruling by the trial court was correct and we believe nothing contained in the trial record warranted submission to the jury for its consideration of any factual question concerning the potential for distinguishing between MCIC and FIE as to liability for breach of the duty of good faith and fair dealing. We believe no reasonable person viewing the evidence, and the reasonable inferences therefrom, could conclude anything other than FIE acted as if it was the insurer in its handling of the Smith claim and that it had a special relationship with insured such that it, like MCIC, was subject to the duty of good faith and fair dealing toward him. Where only one inference can reasonably be drawn from the evidence as to a material issue relating to a party's claim or defense, it is not error for a trial court to remove said issue from the jury's consideration and to direct a verdict thereon. *See Agee v. Gant,* 1966 OK 31, 412 P.2d 155, 156 (Third Syllabus by the Court)(question of negligence or no negligence is one of law for court where but one inference can reasonably be drawn from the evidence as to said issue). Nor is the question of whether an entity other than the named insurer on the applicable insurance policy may or may not be subject to the duty of good faith and fair dealing toward an insured always a question of fact for jury consideration. *See Wathor* (affirming summary judgment in favor of third-party administrator for a self-funded county health insurance program based on determination the undisputed facts presented entitled said administrator to judgment as a matter of law,

as it could not be deemed to have sufficiently acted like an insurer to fasten a special relationship between it and the insured that would give rise to a duty of good faith and fair dealing on the part of the administrator toward the insured).

¶ 56 We also note that FIE's argument concerning the loaned or borrowed servant doctrine is unavailing. In such regard FIE asserts, in effect, although the people that handled the Smith claim were general employees of FIE said employees were loaned to MCIC such that their acts or omissions could only be imputed to MCIC, not FIE. In *Smith v. Hall,* 1966 OK 103, 418 P.2d 665, 666 (Fourth Syllabus by the Court), it was stated:

> The controlling factor in determining whether a regular employee of one master has become the special or loaned servant of another is: Has the general employer released for the time required to perform some particular work, all authority to control or direct the manner and method of the work to be done and surrendered such direction and control to the special master?

As the Court recognized in *Smith,* "[t]he determination of whether the servant of the general employer has become the loaned or hired servant of another is not always a question of fact to be determined by the jury." *Id.* at 670. Basically, where the evidence at trial is such that reasonable persons cannot differ as to the result concerning the loaned servant question, it is proper for a trial court to rule as a matter of law on the issue in favor of the party entitled to prevail on that specific question and to not submit

note, the record presented on appeal contains the verdict form returned by the jury in favor of insured and against insurers, but does not appear to contain the verdict form which was not returned by the jury, i.e., the blank or unsigned form that would have allowed the jury to find in favor of insurers and against insured. Like the verdict form returned that separately identified MCIC and FIE, but required a finding against both, we assume the blank/unsigned verdict form also separately identified MCIC and FIE, but required a finding in favor of both. Plainly, instruction no. 17 (explanation of verdict forms) given by the trial court to the jury, shows the jury was presented with a choice between two verdict forms, one in favor of insured and against insurers and another in favor of insurers and against insured.

We further note, it is, of course, axiomatic that when reviewing a trial court's rulings on a directed verdict we must view the evidence and the reasonable inferences therefrom in favor of the non-movant, i.e., here in favor of FIE as to the argument the trial court erred in granting a directed verdict for insured on the above-referenced point. Only if a *de novo* review of the evidence by us, considering all reasonable inferences therefrom, shows that said evidence only points in one direction, i.e., that both MCIC and FIE were rightfully treated as one entity in regard to the duty of good faith and fair dealing, is it proper for us to affirm the trial court ruling in said regard.

that issue to the jury. *See id.* Our review of the trial record convinces us there was no evidence submitted at trial that would support a reasonable inference that the FIE employees involved in the handling of the Smith claim were placed under the control of MCIC or MCIC employees such that the above test articulated in *Smith* would have required either a directed verdict for FIE on the point or submission to the jury for its consideration of some factual issue concerning the matter. Simply, the trial court did not err by refusing to submit any question to the jury concerning the loaned servant doctrine or in ruling as a matter of law that MCIC and FIE should be treated together concerning their potential liability to insured for any breach of the duty of good faith and fair dealing.[15]

## PART VI. NO REVERSIBLE ERROR OCCURRED BY VIRTUE OF THE ADMISSION OF TESTIMONY FROM DAVID HARDING.

¶ 57 Insurers argue that David Harding, an employee of FIE and the branch claims manager of insurers' office handling Smith's claim in the February–April 2000 period, should not have been allowed to testify as to whether Smith's claim was properly handled.[16] Insurers argue, as a lay witness, he lacked personal knowledge of the facts and circumstances of the adjustor's actions in the handling of the claim. They also assert that some of the questions posed to him during his deposition, some of the answers to which were admitted at trial and used to impeach his trial testimony because he changed his answers thereto, were improper as calling for speculative opinions that were based on hypothetical questions that did not completely and accurately represent certain material facts. Insurers place reliance for their argument(s) on 12 O.S. §§ 2602 and 2701, two provisions contained in the Oklahoma Evidence Code, 12 O.S.2001, § 2101 et seq., as amended.[17]

¶ 58 Harding, although not the immediate supervisor of the adjuster in the February–April 2000 period, was, apparently, as branch

---

**15.** Our ruling that the issue was properly handled by the trial court as a matter of law, disposes of FIE's argument(s) concerning any claim of error relating to the trial court's refusal to give requested jury instructions concerning the borrowed or loaned servant doctrine, the separate status of FIE or presentation to the jury of verdict forms that required the jury to find for or against both MCIC and FIE in regard to any breach of the duty of good faith and fair dealing as if they were but one entity. FIE was not entitled to instructions concerning the borrowed or loaned servant doctrine nor as to its separate status relating to its potential liability. Such recognition provides ample valid reason for 1) the trial court's refusal to give insurers' requested jury instructions nos. 3 (the issues in the case)(mislabeled in insurers' April 8, 2003 appendix, etc. as no. 1) and 19 (loaned employee), and 2) the trial court's refusal to use insurers' requested verdict form contained in their April 8, 2003 appendix, etc.

**16.** Prior to trial, insurers raised the issue concerning the prospective Harding testimony via a motion in limine and the matter was actually argued in more than one written submission presented by them to the trial court. We concern ourselves with what transpired at trial in relation to the Harding testimony complained of by insurers on appeal. This is so because a party aggrieved by a ruling on a motion in limine must raise the issue at the appropriate time during the subsequent trial, either by objecting when the challenged evidence is admitted or by making an

offer of proof if the question involves excluded matter. *Middlebrook v. Imler, Tenny & Kugler, M.D.'s, Inc.*, 1985 OK 66, 713 P.2d 572, 579. Rulings on a motion in limine are advisory and preliminary in nature and error is committed, if at all, when a ruling is made during trial by the trial court. *Id.*

**17.** At the time of trial in June 2002, 12 O.S.2001, §§ 2602 and 2701 were in effect. Both provisions were amended in 2002. See 2002 Okla. Sess. Laws, Ch. 468, §§ 42 and 54. The amendments became effective November 1, 2002. Title 12 O.S. Supp.2002, § 2602 provides:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule is subject to the provisions of [§ ] 2703 of this title.

Title 12 O.S. Supp.2002, § 2703 concerns the bases of opinion testimony by experts. The amendments to § 2602 did not alter the substantive nature of the provision, but merely made the provision gender neutral (i.e., the witness was no longer referred to in masculine nomenclature) and the reference to § 2703 was corrected. Previously, it had been referred to as "Section 703."

Title 12 O.S. Supp.2002, § 2701 provides:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

claims manager, two levels above the adjuster. In other words, the adjuster had an immediate supervisor and then Harding was the head manager of the branch claims office, superior to both the adjuster and the adjuster's immediate supervisor. At the time of trial, Harding had been employed by "Farmers" for about thirty-three and a half (33 & ½) years and he held the position of Oklahoma litigation manager, having been promoted to that job.

¶ 59 Harding was called by insured to testify about the handling of Smith's claim based upon his review of the claims file and his knowledge of insurers' claims practices. At his deposition, he gave certain testimony that, at a minimum inferentially, cast doubt on the reasonableness of insurers' handling of the claim, including the reasonableness of the response by insurers to the request of Smith's lawyers for insured's statement. At trial, however, he explained that facts outside the claims file had come to his attention and, essentially, a regional claims manager from Kansas City and/or an in-house attorney had told him about thirty (30) days prior to trial that a policy holder (i.e., an insured) should never be offered for a prelitigation statement. He then basically testified to the view or opinion that the Smith claim was handled properly.

¶ 60 A trial judge has discretion in deciding whether evidence offered by a party is relevant. *Myers v. Missouri Pacific Railroad Co.*, 2002 OK 60, ¶ *36*, 52 P.3d 1014, 1033. Also, as a general matter, a trial court's rulings either admitting or rejecting evidence on the basis of its relevancy or the lack thereof will not warrant reversal of the judgment under review absent a clear abuse of discretion. *Id.* We find no clear abuse of discretion here.

¶ 61 In our view, at least some testimony from Harding concerning the claim was relevant as he was the branch claims manager at the local office of insurers that had the responsibility over the Smith claim and its handling. Plainly, in view of his position and his long experience in the claim handling field, he was a competent witness as to the procedures and practices concerning good claims handling. Although he may not have been active in the day-to-day handling of the claim prior to April 17, 2000, his review of the Smith claims file, coupled with his experience and his position at the local office handling the claim, would seem to have afforded him sufficient knowledge to opine and comment on the handling of the claim. Further, the purported reasons for any discrepancies between his deposition and trial testimony were made known to the jury and insurers were not foreclosed from eliciting from him the alleged fact that some of his earlier deposition testimony might have been in error, as based on less than adequate knowledge of the complete circumstances involved with insurers handling of the Smith claim.

¶ 62 To us, the matter of Harding's testimony was one involving credibility and the weight to be given to his testimony and, as such, involved fact-based issues for the jury's determination. Questions concerning witness credibility are for the jury's consideration. *Florafax International, Inc. v. GTE Market Resources, Inc.*, 1997 OK 7, 933 P.2d 282, 287. Neither § 2602 nor § 2701 provided a barrier to testimony from Harding challenged by insurers on appeal and

---

1. Rationally based on the perception of the witness;
2. Helpful to a clear understanding of his testimony or the determination of a fact in issue; and
3. Not based on scientific, technical or other specialized knowledge within the scope of [§ ] 2702 of this title.

Title 12 O.S.2001, § 2702 concerns testimony by experts. Prior to its amendment § 2701 provided:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

1. Rationally based on the perception of the witness; and
2. Helpful to a clear understanding of his testimony or the determination of a fact in issue.

As regards this case, our disposition is, of course, controlled by the 2001 version of § 2701 and we have no occasion here to delve into whether some different disposition in relation to the admission of the challenged testimony from Harding would be warranted by virtue of the 2002 amendment, i.e., whether the addition of numbered sentence 3 would somehow materially and substantively require some other ruling.

insurers have failed to show admission of any testimony from him requires reversal for a new trial.[18]

## INSURED'S COUNTER–APPEAL.

## PART VII. THE TRIAL COURT DID NOT ERR IN DIRECTING A VERDICT IN FAVOR OF INSURERS ON THE ISSUE OF PUNITIVE DAMAGES.

■ ¶ 63 By way of counter-appeal, insured challenges the trial court's directed verdict to insurers on the issue of punitive damages. In effect, the trial court found no

competent evidence of conduct rising to the level of reckless disregard or malice on the part of insurers to warrant submission of that issue to the jury. Our review of the trial record confirms that conclusion.

■ ¶ 64 As applicable to this case, 23 O.S.2001, § 9.1 provides that a jury may award punitive damages if it finds, by clear and convincing evidence, that an insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured [§ 9.1(B) ] or an insurer has intentionally and with malice breached said duty. § 9.1(C)(2).[19]

18. Insurers also complain that a certain statement by insured's counsel during the rebuttal portion of insured's closing argument, basically a plea for a specific amount of damages to be awarded, to which insurers' counsel objected and the trial court sustained said objection, was manifest error and clearly prejudiced the jury's damage calculation. Insurers also impliedly, at least, assert the comment caused excessive damages to be awarded. No citation of authority supporting the claim(s) of error in such regard is contained in either the April 8, 2003 brief in chief, etc. nor the June 18, 2003 reply brief, etc. of insurers. "Normally, assignments of error presented in appellate brief(s) unsupported by authority will not be noticed by an appellate court and will be treated as waived." *State ex rel. Dep't of Human Services v. Baggett,* 1999 OK 68, n. 5, 990 P.2d 235. As previously set forth at *supra* note 13, the Rules of this Court also expressly provide in pertinent part that "[a]rgument [in an appeal brief] without supporting authority will not be considered." Okla. Sup.Ct. R. 1.11(k)(1), 12 O.S. Supp.2004, Ch. 15, App. 1. Rule 1.11(k)(1) was in effect when the appellate briefs were filed in this appeal. Although an exception to waiver in regard to an assignment of error that is not supported by citation of authority is recognized when it is apparent the assignment of error, without further research, is well taken (*Baggett,* 1999 OK 68, n. 5, 990 P.2d 235), we do not believe the exception is applicable to the closing argument statement issue. Accordingly, the closing argument statement issue provides no ground to reverse or to grant a new trial.

19. Title 23 O.S.2001, § 9.1 was amended by 2002 Okla. Sess. Laws, Ch. 462, § 1. The current version of § 9.1 may be found at 23 O.S. Supp. 2004, § 9.1. The jury's verdict in this case was filed in the trial court on June 21, 2002. The 2002 amendments were effective July 1, 2002 and said amendments in no way effect our disposition in this case. The prior punitive damage statute, 23 O.S.1991, § 9, was repealed by Okla. Sess. Laws, Ch. 287, § 4 and replaced by 23 O.S. Supp.1995, § 9.1. *Barnes v. Oklahoma Farm Bureau Mutual Ins. Co.,* 2000 OK 55, n. 12, 11 P.3d

162. The only amendment of § 9.1 since its 1995 passage was the 2002 one. The 2002 amendments do not alter the statute as to when it is appropriate to award punitive damages. In essence, the amendments are: some numbering/heading alterations, with grammatical changes made necessary thereby; the word punitive is substituted for the word exemplary in a few places; the words "award punitive" are substituted for the word "give" in § 9.1(A); the words "this state" are substituted for the words "the State of Oklahoma" in a paragraph at the end of § 9.1(C); and the following sentence is added to the end of § 9.1(B), § 9.1(C) and § 9.1(D), "[a]ny award of punitive damages under this subsection awarded in any manner other than as required in this subsection shall be void and reversible error."

We also note that § 9.1 enumerates three categories concerning the availability of varying amounts of punitive damages. Category I [§ 9.1(B) ] applies where the jury finds clear and convincing evidence of reckless disregard and then punitive damages are limited to an amount not to exceed the greater of one hundred thousand dollars ($100,000.00) or the amount of actual damages awarded. Category II [§ 9.1(C) ] applies where the jury finds clear and convincing evidence of intentional conduct and malice and then punitive damages are limited to an amount not to exceed the greatest of five hundred thousand dollars ($500,000.00), twice the amount of actual damages awarded or the increased financial benefit derived by the insurer as a direct result of the conduct causing injury to the plaintiff and other persons or entities. Under Category II the trial court is to reduce the award of punitive damages by the amount it finds the insurer has previously paid as a result of all punitive damage verdicts in any court of this State for the same conduct. Category III [§ 9.1(D) ] also requires an initial jury finding of clear and convincing evidence of intentional conduct and malice. In addition, however, if the trial court finds, out of the presence of the jury, that there is evidence beyond a reasonable doubt that the insurer acted intentionally and with malice and engaged in conduct life-threatening to

In that punitive damages are **only** allowable under § 9.1 when, at a minimum, there is competent evidence of a reckless disregard by the defendant of the plaintiff's rights from which malice and evil intent may be inferred (*see Payne v. DeWitt,* 1999 OK 93, n. 17, 995 P.2d 1088 ), it is not error for a trial court to direct a verdict in favor of a defendant on the punitive damage issue when the court concludes there is no evidence upon which a reasonable jury could find the defendant to have engaged in conduct exhibiting such a reckless disregard.

¶ 65 This Court has recognized that the availability of punitive damages in a case by an insured against his/her insurer for breach of the implied duty of good faith and fair dealing is not automatic, but rather is governed by the standard applicable in other tort cases. *Buzzard v. Farmers Ins. Co., Inc.,* 1991 OK 127, 824 P.2d 1105, 1115. Even where there is evidence to support recovery of actual damages in this type of case, submission of the issue of punitive damages to a jury may be improper. *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 614–615 (10th Cir.1994), citing *McLaughlin v. National Benefit Life Ins. Co.,* 1988 OK 41, 772 P.2d 383, 385, 387 and 389; *Davis v. National Pioneer Ins. Co.,* 1973 OK CIV APP 9, 515 P.2d 580, 583. Such is the import of *Christian v. American Home Assurance Co.,* 1977 OK 141, 577 P.2d 899, where it was held that breach by an insurer of the implied duty to deal fairly and to act in good faith with the insured, "gives rise to an action in tort for

which consequential and, in a proper case, punitive, damages may be sought." *Id.* at 904.

¶ 66 Although the current punitive damage statute contains language specifically referencing insurers when they are sued for breach of the duty of good faith and fair dealing, our recognition in *Buzzard* that such an award is not automatic and is governed by the standard applicable in other tort cases still stands and nothing in § 9.1 has altered this principle. Under § 9.1, for punitive damages to be allowed there **must** be evidence, **at a minimum,** of reckless disregard toward another's rights from which malice and evil intent may be inferred. *Payne,* 1999 OK 93, n. 17, 995 P.2d 1088. Whether that showing has been made remains an issue of law for the trial court in its role as gatekeeper to determine, upon a defendant's challenge to the sufficiency of the evidence via a motion for directed verdict, whether there is competent evidence upon which a reasonable jury could find reckless disregard, from which malice and evil intent may be inferred. The trial court determined the requisite showing was not made in this matter. Our review of the record convinces us the trial court was correct to withhold the issue of punitive damages from jury consideration and that the trial record does not contain competent evidence from which a reasonable jury could find reckless disregard, sufficient to support an inference of evil intent and malice, on the part of insurers toward insured.[20]

---

humans, the jury may then award punitive damages in any amount it deems appropriate.

**20.** Insured also contends on appeal the trial court erroneously excluded evidence that would have supported a punitive damage award. In such regard, insured argues error in the exclusion of evidence concerning and/or relating to Wallis' handling of other claims. The trial court excluded the evidence as not relevant to the instant case and also specifically found any probative value thereof was "far outweighed by the opportunity for excess prejudice." Trial Transcript Vol. III (June 12, 2002), pg. 66. Even assuming the evidence was relevant to the punitive damage issue, we find no abuse of discretion or reversible error in the trial court's ruling, in effect, that any probative value was substantially outweighed by the danger of unfair prejudice. *See Jordan v. Cates,* 1997 OK 9, 935 P.2d 289,

293–294; 12 O.S.2001, § 2403. At the time of trial in 2002, § 2403 provided:

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise.

The amendments to § 2403 in 2002 and 2003 do not affect our disposition. *See* 2002 Okla. Sess. Laws, Ch. 468, § 30; 2003 Okla. Sess. Laws, Ch. 3, § 15.

We also note, insured fails to cite any legal authority on appeal in support of an issue mentioned by him on appeal concerning the trial court's refusing to allow insured at trial to attempt to impeach Paul Middleton (at the time of trial a lawyer in insurers' branch legal office for about eight years) with his earlier deposition testimony. The trial court so ruled because Mid-

## PART VIII. THE TRIAL COURT DID NOT ERR IN DENYING INSURED ATTORNEY FEES.

¶ 67 Insured sought attorney fees in the trial court under two theories, 1) statute-based under 36 O.S.2001, § 3629(B), and 2) common law-based as an element of his damages. The trial court denied his quest for fees. We deal with § 3629(B) first.[21]

¶ 68 Where the core element of the damages sought and awarded in a suit by an insured against his/her insurer for breach of the implied duty of good faith and fair dealing is composed of the insured loss, § 3629(B) allows recovery of reasonable attorney fees to the prevailing insured for time spent preparing and prosecuting the tort suit. *See Taylor v. State Farm Fire and Casualty Co.*, 1999 OK 44, ¶ 11, 981 P.2d 1253, 1258–1259; *see also Barnes v. Oklahoma Farm Bureau Mutual Ins. Co.*, 2000 OK 55, n. 17, 11 P.3d 162 [generally recognizing *Taylor's* holding of § 3629(B)'s applicability to tort-related theory of liability—other than in uninsured or underinsured motorist (UM/UIM) benefit insurance cases—where core element of damages sought and awarded consists of the insured loss, i.e., policy benefits]. Here, insured argues, in effect, the core element of the damages sought and awarded in his tort suit against insurers for breach of the implied duty of good faith and fair dealing was the insured loss or policy benefit of having insurers protect him against exposure to an excess verdict. Insured's argument is flawed and *Taylor's* core element principle as to § 3629(B)'s applicability cannot be stretched to encompass within its meaning of insured loss or policy benefit such a claim. Rather than having as its core element the insured loss or monetary policy benefit, the primary focus and heart of insured's suit against insurers involved his attempt to recover uninsured financial losses **not** covered by the policy of insurance and to recover damages for embarrassment, and mental pain and suffering.

¶ 69 Here, the insured loss was not the "core element" of insured's tort suit against insurers nor was the $10,000.00 liability policy limit part of insured's recovery via the jury verdict. After the excess verdict was rendered against insured in the Smith suit as a result of the vehicular/pedestrian collision, insurers again tendered the policy limits to Smith, which was accepted. This reduced the Smith judgment against insured in such amount. Therefore, § 3629(B) does not support a recovery of attorney fees by insured and the trial court correctly so held.[22]

---

dleton was not afforded the opportunity to read, sign or make corrections to his earlier deposition, which was apparently interrupted for personal reason(s) and not rescheduled. As set forth at *supra* note 18, *State ex rel. Dep't of Human Services v. Baggett*, 1999 OK 68, at n. 5, 990 P.2d 235, provides that unless it is apparent without further research that a claim of error lacking supportive citation to authority is well taken, said claim of error will not be noticed on appeal and will be deemed waived. We deem the Middleton deposition issue waived because of the lack of any legal authority to support it. Further, in addition to his failure to cite any authority and, thus, to properly raise the issue on appeal, we also conclude insured has failed to show any abuse of discretion or reversible error by virtue of the trial court's ruling that he not be allowed to attempt to impeach Middleton with the prior deposition testimony.

21. 36 O.S.2001, § 3629(B) provides:
 B. It shall be the duty of the insurer, receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to the insured within ninety (90) days of receipt of that proof of loss. Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party. For purposes of this section, the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement. In all other judgments the insured shall be the prevailing party. If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable pursuant to the provisions of the contract to the date of the verdict. This provision shall not apply to uninsured motorist coverage.

22. Insured's reliance on federal cases involving insured/insurer disputes over the duty of the insurer to defend and/or pay defense costs associated with litigation between the insured and a third party to support his attorney fee quest, is unavailing. *See e.g., First National Bank of Turley v. Fidelity & Deposit Ins. Co. of Maryland*, 196 F.3d 1186 (10th Cir.1999); *An–Son Corp. v. Holland–America Ins. Co.*, 767 F.2d 700 (10th Cir. 1985). Here, at their expense, insurers provided insured counsel in the initial Smith tort suit brought against him as part of their contractually-based duty to defend him in that litigation.

¶ 70 Insured's claim to a common law entitlement to attorney fees as an element of his damages is also faulty. This Court has determined that an insured is **not** entitled to recover attorney fees as a matter of course as part of a common law element of damages in a suit for breach of the implied duty of good faith and fair dealing. *See Barnes v. Oklahoma Farm Bureau Mutual Ins. Co.*, 2000 OK 55, at ¶¶ 45–54, 11 P.3d at 178–182. We have been provided no viable rationale by insured to deviate from our *Barnes'* holding in such regard in the circumstances shown in this case merely because it involves the liability aspects of an automobile insurance policy, rather than the UIM or UM benefits thereof. Thus, the trial court did not err in denying attorney fees to insured based on his common law entitlement theory.[23] As aptly recognized by the Court of Civil Appeals over thirty (30) years ago, in the absence of an applicable contractual provision or statute "[an] attorney's fee for representing the insured in this [type of] case is not an item of damage but is simply an expense of litigation as it is in any other case where a suit is necessary in order to collect damages because of the defendant's wrong." *Davis v. National Pioneer Ins. Co.*, 1973 OK CIV APP 9, 515 P.2d 580, 584.

## PART IX. THE TRIAL COURT DID NOT ERR IN DENYING INSURED PREJUDGMENT INTEREST.

¶ 71 Insured seeks prejudgment interest under three statutory alternatives. One of the alternatives rests on § 3629(B). No prejudgment interest is recoverable under § 3629(B) for the reasons stated in the immediately preceding part of this opinion, i.e., the core element of the recovery he sought and that was awarded to him via the jury verdict (upon which the judgment under review was based) did not consist of the insured loss.

¶ 72 Insured also attempts to statutorily anchor entitlement to prejudgment interest as to the entirety of the $2,200,000.00 judgment on 12 O.S.2001, § 727(E). This provision provides in pertinent part:

[I]f a verdict for damages by reason of personal injuries or injury to personal rights including, but not limited to, injury resulting from bodily restraint, personal insult, defamation, invasion of privacy, injury to personal relations, or detriment due to an act or omission of another is accepted by the trial court, the court in rendering judgment shall add interest on the verdict at a rate prescribed pursuant to subsection I of this section from the date the suit resulting in the judgment was commenced to the earlier of the date the verdict is accepted by the trial court as expressly stated in the judgment, or the date the judgment is filed with the court clerk.

In construing the above language as to when prejudgment interest is properly allowed thereunder, this Court decided in *Majors v. Good*, 1992 OK 76, 832 P.2d 420, 422–423 that recovery for either personal injury or injury to personal rights is a necessary element and, in essence, that the phrase, "detriment due to an act or omission of another" contained in § 727(E), did **not** open the prejudgment interest floodgates under the provision irrespective of the presence of one or the other of the aforementioned necessary elements. *Majors*, 832 P.2d at 422–423.[24] *Majors* involved suit by two individual stockholders in certain corporations against two other individuals (officers and stockholders in the same corporations), and concerned claims

---

**23.** To the extent *Taylor v. State Farm Fire and Casualty Co.*, 1999 OK 44, 981 P.2d 1253 contains language generally authorizing the recovery of attorney fees as a common law element of damages in a tort suit by an insured against an insurer for breach of the implied duty of good faith and fair dealing, such authorization, of course, stands disapproved by this Court's overruling of *Brashier v. Farmers Ins. Co., Inc.*, 1996 OK 86, 925 P.2d 20 in such regard in *Barnes v. Oklahoma Farm Bureau Mutual Ins. Co.*, 2000 OK 55, ¶ 51, 11 P.3d 162, 180.

**24.** At the time *Majors v. Good*, 1992 OK 76, 832 P.2d 420 was decided the pertinent language in § 727 was found at 12 O.S.1991, § 727(A)(2). For the most recent amendments to § 727 consult 2004 Okla. Sess. Laws, Ch. 368, § 6 or 12 O.S. Supp.2004, § 727. For a new statute concerning post and prejudgment interest, 12 O.S. Supp.2004, § 727.1, consult either the 2004 O.S. Supp. or 2004 Okla. Sess. Laws, Ch. 368, § 7.

for breach of fiduciary duty, misuse of corporate funds and assets, and conflict of interest. The plaintiffs in *Majors* recovered monetary relief but were held not entitled to prejudgment interest under § 727, as the damage resulted from a business loss, not from personal injury or injury to personal rights. *Majors*, 832 P.2d at 422–423.

¶ 73 In the present case, the jury was instructed in fixing the amount of damages to consider financial losses (past and future), embarrassment, and mental pain and suffering. The general verdict returned by the jury did not distinguish between financial losses and the other elements (i.e., embarrassment, and mental pain and suffering) that were allowed to be considered by the jury in reaching an amount of damages. Plainly, part, if not all, of insured's financial losses consisted of the excess judgment entered against him in the initial Smith tort suit. Although said financial loss cannot be said to be a business loss like that involved in *Majors*, we believe giving the salient language of § 727(E) a reasonable construction—particularly in light of the examples given for the types of tortious conduct covered, i.e., bodily restraint, personal insult, defamation, invasion of privacy, injury to personal relations—leads to the conclusion that recompense for the economic loss or harm of such an excess judgment is not the type of loss or injury contemplated by the Legislature in § 727(E). Under the general verdict we have before us here, one that makes no distinction between financial losses and damages for embarrassment, and mental pain and suffering, insured is not entitled to recover prejudgment interest on the entirety of the $2,200,000.00 judgment.

 ¶ 74 Insured also argues, in effect, that even if he is not entitled to recover prejudgment interest on the entirety of the judgment, he is entitled to recover, under § 727, prejudgment interest on the amount of the judgment representing damages for embarrassment, and mental pain and suffering. There can be no question that under *Timmons v. Royal Globe Ins. Co. (Timmons II )*, 1985 OK 76, 713 P.2d 589, when a severed element of damage recovery in the form of recompense for embarrassment, and mental pain and suffering is allowed and separately identified in a jury verdict, § 727(E) applies to allow prejudgment interest thereon. The general verdict in this matter, as already mentioned, however, did not separately identify those damages awarded for personal injury or injury to personal rights, and those for financial loss. Accordingly, the matter appears to be placed squarely within the following pronouncement from *Timmons II*, "[i]f damages 'by reason of personal injuries' are shown to have been intermixed with other elements of damage in one general verdict, the provisions of 12 O.S.1971 § 727 (2) [as applicable here, 12 O.S.2001, § 727(E) ] cannot be invoked for allowance of prejudgment interest." *Timmons II*, 713 P.2d at 593, n. 14.

¶ 75 We are not persuaded by insured's argument, in essence, that the amount of the general verdict against insurers represents financial loss in the form of the Smith judgment (with appropriate pre- and post-judgment interest, and presumably minus the $10,000.00 policy limits paid and accepted by Smith after that judgment), while the balance may be attributed to embarrassment, and mental pain and suffering. In our view, in the circumstances of this case, only a special jury finding splitting the damages awarded into separately identifiable components would be sufficient to provide a basis for prejudgment interest under § 727(E). To rule otherwise and to now attempt judicial division of the damages awarded (as insured would have us do), would involve speculative guesswork on our part, something that is neither warranted or proper.

 ¶ 76 Insured's final statutory alternative for prejudgment interest is 23 O.S. 2001, § 6, which in pertinent part allows prejudgment interest as to "damages [which are] certain or capable of being made certain by calculation, and the right to recover is vested ... upon a particular day." [25] Basi-

---

**25.** 23 O.S.2001, § 6 provides in full:
Any person who is entitled to recover damages certain, or capable of being made certain

by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from

cally, insured's reliance on § 6 suffers from the same infirmity as does his reliance on § 727, to wit: he seeks to separate a general jury verdict into distinct components, that we do not believe may rightfully be so separated. In sum, we hold the trial court did not err in denying insured's quest for prejudgment interest.

## PART X. CONCLUSION.

¶ 77 The trial court did not err in submitting the issue of breach of the implied duty of good faith and fair dealing to the jury; nor in declining to direct a verdict in favor of FIE based on the assertion it was not the insurer; and no reversible error has been demonstrated in the trial of this matter that would warrant overturning the judgment in favor of insured for $2,200,000.00 in actual damages or that would warrant affording MCIC and/or FIE a new trial. Further, the trial court did not err in directing a verdict in favor of insurers as to the issue of punitive damages; nor did the trial court err in denying insured's quests for attorney fees and prejudgment interest.

¶ 78 The trial court judgment entered on the jury verdict and the trial court orders denying insured attorney fees and prejudgment interest are **AFFIRMED.**

¶ 79 WATT, C.J., LAVENDER, EDMONDSON and COLBERT, JJ., and SUMMERS, S.J. (sitting by designation in lieu of KAUGER, J.), concur.

¶ 80 TAYLOR, J., concurring specially.

¶ 81 WINCHESTER, V.C.J., HARGRAVE and OPALA, JJ., dissent.

¶ 82 KAUGER, J., recused.

TAYLOR, J., with whom WATT, C.J., and COLBERT, J., join, concurring specially:

¶ 1 I concur with all of the majority opinion but write specially to express my views. Trial and appellate courts must give "bad faith" claims very close, careful and, sometimes, skeptical scrutiny. Bad faith claims must be firmly and fairly considered based upon the law and evidence of the case. I am convinced that the trial judge was correct in submitting the issue of bad faith to this jury.

¶ 2 Insurance companies, like other companies seeking to increase their market and customer base, have turned to mass marketing of liability insurance policies just as other companies market soap and cars. Through its advertising, the insurance company beckons the consumer to do business with it based upon slogans that suggest the liability insurance company will look after its customer's best interest. The insurance company promises the customer will be in good hands and treated with caring and neighborly concern. Soothing and comforting music plays in the background of these advertisements. Based on these advertisements, it is only reasonable for customers to rely on the insurance company to handle claims with care and concern for the customer's financial and legal interests.

¶ 3 These reassurances are part of the insurance contract requiring an insurance company to act in good faith and fair dealing toward its customers. *See Wathor v. Mutual Assurance Adm'rs, Inc.*, 2004 OK 2, ¶ 5, 87 P.3d 559, 561. The insurance contract places more responsibility on the insurance company than just paying claims. *Christian v. American Home Assurance Co.*, 1977 OK 141, ¶ 24, 577 P.2d 899, 904. Liability insurance coverage is more than just a performance or surety bond that will be paid if a claim is justified.

¶ 4 When a liability insurance policy is purchased, the customer is buying more than just the payment of a potential claim. The customer is buying coverage. The customer is buying comfort. The customer is buying peace of mind. The customer is buying the skill of the insurance company to negotiate and settle claims in his best legal and financial interest. The customer is buying the right to counsel and the best advice the insurance company has to offer.

¶ 5 The essence of the insurance company's contractual duty owed in this case is set out

that day, except during such time as the debtor is prevented by law, or by the act of the credi-

tor from paying the debt.

in the majority opinion at paragraph 26 which states:

> In dealing with third parties, however, the insured's interests must be given faithful consideration and the insurer must treat a claim being made by a third party against its insured's liability policy "as if the insurer alone were liable for the entire amount" of the claim....

(Citations omitted.)

¶ 6 If the insurance company in this case had acted with good faith and fair dealing, Mr. Badillo would have been called to consult with the professional claims staff about the request that he give a statement. He would have been encouraged to give such a statement. The statement may have been very helpful in settling this case. The statement would have been that Badillo was not drinking, was not on an employer-related errand, made $8.50 an hour, had few assets, had no other insurance, and was basically "judgment proof". At the very least, a strategy could have been developed **attempting** to protect Mr. Badillo rather than leave him hanging out for his financial life. The insurance company at least owed him this service.

¶ 7 This minimal effort by the insurance company would have been a basis for a successful defense against this bad faith claim and also would have potentially limited Badillo's liability to his policy limits. If the insurance company had handled this case with care and neighborly concern, the extent of its liability would have been the $10,000 policy limit.

¶ 8 There is a nationwide debate about "lawsuit abuse" and the proliferation of lawsuits. It will be a good day for all when the size and number of lawsuits go down. But as long as there are cases with evidence such as in this case, judges must submit these issues to a jury and let a jury decide. This lawsuit shows the role of the courts in carrying out the mandate of the Oklahoma Constitution that "speedy and certain remedy [be] afforded for every wrong and for every injury to person, property, or reputation...." Okla. Const. art. 2, § 6. The Constitution further provides "that right of trial by jury shall be and remain inviolate...." *Id.* at art. 2, § 19; *see* 12 O.S.2001, § 556. After carefully con-

sidering the law and evidence of this case, I am resolved that the trial judge correctly submitted the breach of good faith and fair dealing issue to the jury.

¶ 9 Under the evidence in this case, these issues must be submitted to a jury. Without this evidence of conduct by this insurance company, there would have been no case to submit to the jury. If insurance companies wish to prevent bad faith cases, then they must govern themselves in accordance with the law and the terms of the insurance products they market and sell. When that day comes, then bad faith cases will become a relic of the past.

¶ 10 The dissent mistakenly views this case as involving the duty to pay. The duty of good faith and fair dealing of the insurance company does, in fact and law, involve more than simply paying a claim. It extends to the settlement and defense of a claim. However, nothing in the majority opinion or this special concur would obligate the insurance company to offer to pay some amount greater than the liability policy limits in settling with a third party.

¶ 11 This jury was properly instructed and reached its verdict based upon the law and evidence. I can find no preserved evidentiary, factual or legal error in the jury's verdict. It should remain undisturbed.

WINCHESTER, V.C.J., with whom OPALA, J., joins, dissenting:

¶ 1 Today, the majority hands down a landmark case that is the first to hold an insurance company violated its duty of good faith and fair dealing to its insured, despite its timely settlement offer of the insured's policy limits and the third party victim's subsequent acceptance of that offer. In so doing, the majority discards, without reference, our established precedent that:

> "Tort liability arises only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured. Because withholding payment is a necessary element of a claim for bad faith in refusing to pay a legitimate claim, the actions of an insurer after payment is made cannot be the basis of the bad faith claim. Because disagree-

ments can arise concerning the amount of coverage, cause of loss, and breach of policy conditions, the tort of bad faith does not prevent the insurer from resisting payment or resorting to a judicial forum to resolve a legitimate dispute."

*Skinner v. John Deere Insurance Company,* 2000 OK 18, ¶ 16, 998 P.2d 1219, 1223.

Accordingly, I respectfully dissent.

¶ 2 The facts of this cause are as follows. Mario Badillo, insured driver and appellee/counter appellant herein, struck a pedestrian, Loretta Smith, (victim) in a crosswalk with his vehicle. She sustained severe injuries that resulted in medical expenses exceeding $700,000.00. Mid Century Insurance Company, one of the appellants/counter appellees, was the liability insurer of Badillo's vehicle. Badillo's insurance contract carried a policy limit of $10,000.00.

¶ 3 Smith's sister employed lawyers on Smith's behalf, who contacted Mid Century's adjuster. At their request, appellants sent them a check for the policy limits, along with a release. They refused the release, absent a statement from Badillo. The claims adjuster refused to produce Badillo for a statement, to protect him from potential criminal liability.

¶ 4 Smith's attorneys then employed a trial lawyer, who telephoned the adjuster and again demanded they produce Badillo for a statement. He threatened to file a lawsuit and refuse subsequent settlement offers, if appellants failed to do so. While the adjuster said he would explore the possibility, he never had the chance because Smith's trial lawyer filed the instant action within four hours of their conversation.

¶ 5 Mid Century provided independent counsel for Badillo. At trial, the jury awarded damages in the amount of $1,000,000.00, finding Badillo 60% negligent. His portion thereof, together with interest, resulted in a total judgment against him of $633,202.63. Badillo did not appeal. Mid Century again tendered the policy limits to the victim, which she accepted.

¶ 6 Smith's trial attorney tried to collect from Badillo, but knew it was impossible. When the hearing on assets revealed few, if any, nonexempt assets and insufficient income to pay, Smith's trial attorney suggested Badillo sue appellants for bad faith. He told Badillo he could use the proceeds to satisfy the judgment against him, and even offered to suspend collection attempts until resolution of the bad faith litigation.

¶ 7 Badillo then filed the instant matter. At the close of trial, appellants moved for directed verdict on the bad faith claim and on the punitive damages claim. The court denied the motion as to the bad faith claim, granted it as to the punitive damages claim, and found no evidence of reckless disregard or malice by the insurer. The jury returned a verdict against appellants in the amount of $2,200,000.00, for financial losses, embarrassment, and mental pain and suffering. The trial court entered judgment but refused to award attorney fees or prejudgment interest.

¶ 8 As a result of the majority's holding today, a tortfeasor who paid premiums on a $10,000.00 insurance policy now will receive a judgment on jury verdict of $2,200,000.00, an amount not only 220 times greater than his liability policy, but also an amount nearly four times greater than the award his victim received.

¶ 9 When we first recognized the tort of bad faith failure to settle an insurance claim, we adopted the general rule that "[A]n insurer has an implied duty to deal fairly and act in good faith with its insured and the violation of this duty gives rise to an action in tort...." *Christian v. American Home Assurance Company,* 1977 OK 141, ¶ 25, 577 P.2d 899, 904. The majority's opinion today blurs this duty by awarding the insured driver, a tortfeasor, $2,200,000.00 for a bad faith claim on a $10,000.00 policy, after the insurer not only offered early on to settle for the policy limits, but also after payment of the full policy limits to the third party victim. It is difficult to imagine the acts the majority expects from insurance companies, to avoid a bad faith claim. Indeed, their opinion fosters confusion among attorneys for insurance carriers and for insured parties, alike, in their attempts to decipher exactly what is required of them, now, to settle a claim. This certainty is a fundamental facet of the system that allows the former to remain in the business

of providing insurance based upon risk assessment and exposure calculations, and the latter to afford payment of reasonable premiums for insurance coverage.

¶ 10 The majority articulates a standard for bad faith claims against an insurer that "is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer." The references to "reasonable" conduct, versus "unreasonable" conduct, vis-à-vis an insurer to its insured, blur the lines of demarcation between actions in negligence and the tort of bad faith.

¶ 11 In 1935, this Court rejected negligence as a basis for recovery when an insurer refused to settle a claim for damages covered by the insured's policy. *Boling v. New Amsterdam Cas. Co.*, 1935 OK 587, ¶¶ 11, 12, 46 P.2d 916, 917–918. Although the bad faith tort was more than negligence, it developed into something less than a specific intent tort. Bad faith requires evidence of dishonest intentions, an advantage that is not conscientious, or an action taken that is unreasonable and unfounded. *See,* 25 O.S.2001, 9. In contrast, the majority's standard for bad faith culpability by an insurer provides no concrete guidance for future litigants, but instead foists upon them a subjective standard open to a different interpretation by every person who examines it. Indeed, it already has, as evidenced in the numerous cases from other jurisdictions cited by the majority in today's pronouncement.

¶ 12 While I believe the majority's opinion, as well as the objections of appellants and Badillo's answer, all indicate confusion over what actions of an insurer comprise bad faith, there is no confusion as to one essential element thereof, and it clearly is not present in the instant matter. As I stated hereinabove, withholding payment is a necessary element of a claim for bad faith in refusing to pay a legitimate claim. *Skinner v. John Deere Insurance Company*, 2000 OK 18, ¶ 16, 998 P.2d 1219, 1223. In this action, it is undisputed that appellants not only tendered a check in the amount of the policy limits early on, but also that they again tendered that check, and the third party victim accepted it, prior to the filing of Badillo's bad faith claim. An essential element of appellee's bad faith claim is not met, and this is plainly evident in the undisputed facts of the instant case. I would continue to follow the teachings articulated by the Court in *Christian* and *Skinner*. This matter never should have gone to the jury, the reasonableness of appellants' conduct never should have arisen and this appeal never should have ensued. The majority's opinion further complicates the issues surrounding what acts will give rise to a bad faith claim, and what acts may be taken to avoid such a claim.

¶ 13 The irony and inherent injustice of this result, the distortion of our holding in *Christian* and its progeny, and the overruling, without mention, of *Skinner,* all compel me to respectfully dissent. I believe that the uncontested facts fail to support a breach of the duty of good faith and fair dealing under *Christian* and *Skinner*. Therefore, I would hold that the trial court should have granted the appellants' motion for a directed verdict.

OPALA, J., with whom WINCHESTER, V.C.J., joins, dissenting.

¶ 1 The court affirms the *nisi prius* imposition of liability upon Mid Century and Farmers Insurance (insurers) for a *Christian*[1] bad-faith tort. I would reverse the trial court's judgment against these defendants/appellants. The plaintiff's judgment lacks support in competent evidence. The court's holding has cavalierly removed from the elements of a bad-faith tort the requirement that an insurer's conduct be shown to have been taken in bad faith. The court has also discarded (or disregarded) the legal distinction between the elements of unreasonableness and those of bad faith. The result produced here today foists liability for the insurer's mere failure to procure a settlement by means that would confer a benefit **only** upon a third party rather than upon its own insured. Because the record of the insurer's actions does not demonstrate bad faith towards the insured, I dissent from the

---

1. *Christian v. American Home Assurance Company,* 1977 OK 141, 577 P.2d 899

court's judgment as well as from its pronouncement.

## I

## THE ADDUCED PROOF DOES NOT SUPPORT A CLAIM FOR BAD-FAITH REFUSAL TO SETTLE A COVERED LOSS

¶ 2 The trial record is devoid of proof of the insurers' bad faith either to indemnify or defend their insured. The insurers neither acted in bad faith nor denied a benefit owed their insured under the policy. The requisite elements of the tort in suit were not established. Liability at *nisi prius* was hence incorrectly imposed.

### The Elements of a Bad–Faith Claim

¶ 3 The *Christian* bad-faith tort [2] imposes liability upon an insurer "only where there is a clear showing that the insurer unreasonably, and in bad-faith, withholds payment of the claim of its insured." [3]

¶ 4 The conduct of an insurer must be examined in light of the information *known* or *knowable* by the insurer at the time performance under the contract was requested.[4] When presented with a claim by its insured,

2. Commonly referred to simply as the bad-faith tort.

3. *Christian v. American Home Assurance Company, supra* note 1, 1977 OK 141, ¶ 26, 577 P.2d at 905; *Christian* imposes liability upon an insurer who provided disability insurance. **The holding in *Christian* now applies to all insurers.** *See McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, 637 P.2d 583.

4. *Buzzard v. McDanel*, 1987 OK 28, ¶ 10, 736 P.2d 157, 159.

5. There are two narrow exceptions to this rule. **First,** insurers may withhold immediate payment during a reasonable investigation into the validity or value of the claim. *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, ¶ 14, 824 P.2d 1105, 1109. **Second,** if there is a dispute about the validity or value of a claim, an insurer may, without subjecting itself to liability, defer payment by resorting to a judicial forum to settle the dispute. *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, ¶ 12, 681 P.2d 760, 762. A tort claim also lies for a breach of duty to defend an insured against third-party claims covered by the policy.

an insurance company must tender prompt payment due under the terms of its policy.[5]

¶ 5 The elements of a bad-faith claim require that an insurer **do not:**

(1) Be Unreasonable;

(2) Take action in bad-faith; [6]

(3) Act to withhold a benefit owed to its insured under the terms of the policy.

The presence of the claim's requisite elements must be proved and judicially assessed in light of information that was **known** or **knowable** to the insurer at the time benefits were alleged to have been tortiously withheld.

### The Elements Of A Bad–Faith Tort Claim Must Be Those Which Harm The Insured, Not Another Person

¶ 6 The bad-faith tort was crafted to ameliorate the unequal bargaining power of an insured vis-a-vis the insurer. It injects a public-law element into the contract-based status that governs the parties.[7] The duty to act in good faith is derived from the contractual relationship between an insurer and its insured.[8] The bad-faith tort is a private-law remedy inuring exclusively to the insured.

*Wilson v. Gipson*, 1988 OK 35, ¶ 26, 753 P.2d 1349, 1356.

6. "Bad faith is the antithesis of good faith and our Legislature has told us in statutory language what constitutes good faith. In 25 O.S.1941 § 9, we are told: 'Good faith consists in *an honest intention to abstain from taking any unconscientious advantage of another,* even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.'" *National Mut. Cas. Co. v. Britt*, 1950 OK 159, ¶ 10, 218 P.2d 1039, 1041 (emphasis added). The definition remains in force today at 25 O.S.2001 § 9.

7. *Christian, supra* note 1, 1977 OK 141, ¶ 11, 577 P.2d at 902.

8. Absent a contractual or statutory relationship between the plaintiff and defendant in a bad-faith suit, there can be no duty owed and none breached. *Allstate Ins. Co. v. Amick*, 1984 OK 15, ¶ 14, 680 P.2d 362, 364. The court has created a single exception to its prohibition of third-party suits for bad faith. An action will lie when the third party is the named beneficiary of an insur-

It serves to vindicate a harm dealt *to the insured*[9] by the insurer's substandard conduct.

### The Trial Court Erred By Not Granting, At The Close Of The Evidence, The Insurer's Motion For A Directed Verdict

¶ 7 A motion for directed verdict may be sustained **only when** there is an entire absence of proof on an issue on the claim's merits or defense and should be denied when there are questions upon material facts or reasonable persons could differ on the choice of inferences to be drawn from the facts in evidence.[10] To determine whether a plaintiff's evidence is sufficient to withstand a motion for directed verdict, the trial court must consider as true all evidence favorable to the plaintiff together with all reasonable inferences to be drawn from it, and disregard all conflicting evidence favorable to the movant.[11] Only if all the inferences to be drawn from the evidence favor the moving party will a directed verdict withstand appellate scrutiny. We review *de novo* the denial of insurers' motion for directed verdict.[12]

¶ 8 There is here no record evidence that proves a withholding of benefits owed to the insured under the policy. Undisputed proof clearly establishes that payment was tendered to counsel for Ms. Smith (the third-

party claimant) on behalf of Badillo (insured). **That tender was rejected.** Upon judgment against the insured, the insurers once again tendered the policy limits to fulfill their indemnification obligation of the policy. Insured's attempts to weave a bad-faith claim from the insurers' *withholding of a statement* sought from the insured clearly must fail. There is no legal support for that position.

¶ 9 Evidence relating to the state of mind of the third-party's lawyers' willingness to settle an unfiled lawsuit *is irrelevant to a bad-faith analysis and to forensic insights into the claim.* **The relevant inquiry must be confined to the state of mind and to the intent of the insurer at the critical time in question.**[13] Even assuming that the favorable verdict on reasonableness was based in no part on the irrelevant evidence regarding the third party's state of mind, there is here no evidence that can satisfy the element of insurer's bad faith.

¶ 10 To establish insurer's bad faith, the proof must demonstrate that the insurer's conduct was taken in disregard of the requisite good-faith intent. There is no evidence in this record which shows that Farmers/Mid Century failed to act without an honest intention to abstain from taking any unconscientious advantage of Badillo.[14] Nothing in the

ance policy. *Roach v. Atlas Life Ins. Co.*, 1989 OK 27, ¶ 8, 769 P.2d 158, 161.

9. The tort does not inure to the benefit of one who is not a party to the contract.

10. *Handy v. City of Lawton*, 1992 OK 111, ¶ 8, 835 P.2d 870, 872–3.

11. *Fleming v. Baptist General Convention*, 1987 OK 54, 742 P.2d 1087, 1091–92; *Condo v. Beal*, 1967 OK 30, 424 P.2d 48, 51; *Orthopedic Clinic v. Hanson*, 1966 OK 119, 415 P.2d 991, 995; *Sisler v. Whitten*, 1964 OK 71, 393 P.2d 497, 503; *Price v. Smith*, 1962 OK 173, 373 P.2d 242, 244.

12. *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 6, 49 P.3d 732; *Cities Service Co. v. Gulf Oil Corp.*, 1999 OK 14, ¶ 11, 980 P.2d 116, 124.

13. A proper inquiry into a potential bad-faith withholding of a benefit must focus upon two questions: (1) whether the insurer's conduct was unreasonable and (2) whether it was taken in bad faith.

14. In fact there is evidence suggesting that, though the insurers' conduct may have, in retrospect, constituted an error in judgment, that the actions nonetheless amounted to good faith. Testimony of Cynthia Burton, attorney for third party, on direct examination by insurer's attorney, trial transcript Volume VII, page 131:

Q—When you talked to Mr. Wallis [insurers' agent], he told you that he didn't think that it is in Mr. Badillo's best interests to give a statement, right?
A—He kept saying, "I have to defend my client."
. . .
Third-party attorney Burton informed insurers' agent that one purpose of a statement would be to determine if the insured had been drinking before the accident. From the testimony of Howard K. Berry, attorney for third party, on cross-examination by insurers attorney, trial transcript Volume VI, page 79:
Q—[ . . . ] Have you ever told me that one of the reasons why someone would not want to produce another person for a statement if there is a possibility of drinking involved and there's someone badly injured and in the hospital is the possibility of criminal prosecution?

record suggests that the actions of the insurers amounted to anything greater than an unreasonable error in judgment.[15] **No record proof demonstrates that insurers' failure to produce the insured for a statement was done in a bad-faith effort to avoid or defeat their own liability to Badillo.**

¶ 11 The insured's claim attempts to create a new remedial construct utterly foreign to Oklahoma's bad-faith jurisprudence. The new tort would best be described as cross-pollination of hand-selected elements of an insurer's good-faith duty to indemnify an insured and of its obligation to defend against claims and to settle them within the limits of the policy.[16] Any insurer who fails *successfully* to settle a covered loss with a third party *prior to the commencement of litigation* or within the limits of the policy would, under the new construct, be held liable if, in retrospect, its failure could be deemed unreasonable. **The new delict would eliminate good-faith element now present in the *Christian* tort, transfer the benefit of an insurer's contract obligation to a third party, and utterly remove the demand requirement as a trigger of the insurer's duty to defend or to settle within the limits of the policy.** Under the existing *Christian* jurisprudence, the insured can prove here no claim either for failure to indemnify or to defend. It is solely through the guise

of a clever cross-pollination construct that liability came to be imposed upon the insurers in this suit.

### III

**OKLAHOMA DOES NOT REQUIRE AUTOMOBILE LIABILITY INSURERS TO ASSIST OR COOPERATE WITH THIRD–PARTY PLAINTIFFS IN THEIR EFFORTS TO SEARCH FOR ACTORS, OTHER THAN THE INSURED, WHO MAY BE LIABLE TO SUIT**

¶ 12 Insurers attempted to indemnify Badillo, and when their attempt was rejected by the third party Badillo was provided a defense. Insurers, who merely refused to produce Badillo for a statement, were held liable here for failure to aid the third-party claimant's lawyers. Producing Badillo would only have aided the third party in crafting a case against Badillo. There was no expectation Badillo would be exonerated of liability after giving the statement.

¶ 13 The focus of any analysis of an insurer's offending conduct must concentrate **exclusively on the effects that conduct may have had upon the insured.** A third party may receive a benefit from an insurer's conduct only when that benefit is conferred inci-

A—That sounds like my words
Q—All right. You told me that that would be a legitimate reason not to produce someone for a statement.
A—I think so.

**15.** An error in judgment does not constitute bad faith. *Britt, supra* note 6, 1950 OK 159 ¶¶ 16–18, 218 P.2d at 1039, citing with approval *Georgia Casualty Co. v. Mann*, 242 Ky. 447, 46 S.W.2d 777, 780 (1932)["[T]he most that can be said is that, in refusing to settle, the insurance company committed a mere error of judgment for which it cannot be held liable."], *Mendota Electric Co. v. N.Y. Indemnity Co.*, 175 Minn. 181, 221 N.W. 61, 62 (1928) ["it takes something more than mere mistake to constitute bad faith. [ . . . ] But it takes something more than error of judgment to create liability."], and *Lawson and Nelson Sash and Door Co. v. Associated Indemnity Corp.*, 204 Minn. 50, 282 N.W. 481, 483 (1938) ["The most that can be said about the whole situation retrospectively is that [Attorney for third party's] judgment was better than that of

[Attorney for insurer's], i.e., it would have been better for all concerned if the proposed settlement had been made effective. But, after all, no mortal has the gift of prophecy."]

**16.** "The defense duty is measured by the nature and kinds of risks covered by the policy as well as by the reasonable expectations of the insured. An insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the potential of liability under the policy. The insurer's defense duty is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer *at the time the defense is demanded* (or tendered) rather than by the outcome of the third-party action. *An insurer ordinarily has no duty to defend an insured absent a request to provide a defense,* which act serves to trigger the insurer's performance under the contract." *First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland,* 1996 OK 105, ¶¶ 13–14, 928 P.2d 298, 303–304 (emphasis added).

dentally as a consequence of an action taken to benefit the insured. Insurers had no duty to aid the third-party claimant if to do so was not absolutely necessary to benefit Badillo. There was no assurance that aiding third-party claimant's lawyers would have been of benefit to Badillo.[17] Liability was incorrectly foisted upon the insurers for failing to aid a third party when that action's benefit to the insured was not shown to be anything more than a remote possibility.

## IV

## THE STANDARD OF CARE, WHOSE BREACH GIVES RISE TO AN ACTIONABLE TORT CLAIM AGAINST

## THE INSURER, CALLS FOR A SHOWING OF WANT OF GOOD FAITH IN HANDLING THE CLAIM

¶ 14 The standard of care whose nonfulfillment will give rise to an insured's actionable claim against the insurer for bad faith emanates from the latter's refusal to settle in good faith a covered loss. It falls neither under the common-law [18] rubric of a willful delict nor into the category of claims in negligence.[19] The bad-faith tort, which is to be regarded as *sui generis*,[20] stands predicated

---

17. The third party *might* have settled the claim had it received the aid of the insurer through producing the insured, but it would make no guarantee to the insurers that producing the insured would result in a settlement. The determination of whether Badillo would have received the benefit of settlement could have been made only after he was produced for a statement.
From the direct examination of third-party attorney Cynthia Burton by counsel for the insurers. Trial transcript volume VII, page 128–129:
Q—When you were telling Mr. Wallis [insurers' agent] that-requesting a statement from Mr. Badillo before you would advise Ms. Smith to sign a release, you were telling him that there was no assurance that if Mr. Badillo gave a statement, the case would settle, true?
A—No.
Q—It was certainly possible, after talking to Badillo, you were going to pursue the case.
A—It depended on what happened with our conversation with Mr. Badillo as to what we would do.
Q—It was conditional upon the conversation that you had with Mr. Badillo, right?
A—Correct.
Q—In other words, whether the case would settle depended on what Mr. Badillo told you, right?
A—Yes.
Q—And how he would respond to the questions, right?
A—Yes.
Q—And whether you believed him or not when he gave you the answers, right?
A—Yes.
Cross-examination of Howard Berry, trial lawyer for third party, by insurers' counsel, Trial transcript volume VI, page 76:
Q—My question was meant to be—you used the word assurance earlier, some word or term of art. The bottom line is, you never told Mr. Wallis, nor was it part of your plan that if Mr. Badillo gave a statement, there was a guarantee or assurance that this claim would settle; isn't that true?
A—Correct. There had to be a clearing type of a statement. In other words, he had to give us the information that we needed, which was that he wasn't on the job.

Q—He had to give you the information you needed. You had to believe him.
A—Yeah.

18. The common law, also called the unwritten law, was known at its English birth by the Latin name of *lex non scripta regni Angliae or consuetudo Angliae.* A body of non-statutory law of the kingdom of England and Wales, it originated from custom and judicial decisions. *Great Plains Federal Sav. and Loan Ass'n v. Dabney,* 1993 OK 4, ¶ 4 n. 19, 846 P.2d 1088, 1096 (Opala, J., concurring). The common law is distinct from statutory law in that the doctrines of the former are open to judicial repudiation, modification and expansion, while statutes are not so elastic. *Deffenbaugh v. Hudson,* 1990 OK 37, ¶ 15, 791 P.2d 84, 88.

19. Negligence and willful conduct are the traditional common-law rubrics for tort liability. These rubrics are mutually exclusive and governed by distinct standards of care. *Graham v. Keuchel,* 1993 OK 6, ¶ 49, 847 P.2d 342, 362. The rubrics are not mandatory for all tort liability in Oklahoma. The provisions of 12 O.S.2001 § 2 grant the courts the authority to expand and modify the common law. *See Pribram v. Fouts,* 1987 OK 29, ¶ 13, 736 P.2d 513, 515. Courts may expand tort law within the confines of either rubric or, as it is the case with the *Christian* tort, create a new tort independent of and *dehors* the two traditional common-law rubrics.

20. The *Christian* tort is not a traditional common-law tort. It is a new appendage, and its boundaries are properly set by the judiciary. "The common law, followed in Oklahoma, refers not only to the ancient unwritten law of England, but also to that body of law created and preserved by decisions of courts. The common law is not static, but is a dynamic and growing thing and its rules arise from the application of reason to the changing conditions of society. Flexibility and capacity for growth and adaptation is its peculiar boast and excellence." *McCormack v. Oklahoma Pub. Co.,* 1980 OK 98, ¶ 7, 613 P.2d 737, 740.

on bad-faith breach of the insurer's contract-based fundamental duty to protect the insured in good faith against the liability consequences of a policy-covered loss.

¶ 15 Bad-faith[21] is statutorily defined by the provisions of 25 O.S.2001 § 9, where its meaning is explained in this language:

> Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.

The standard of care for whose breach will arise a bad-faith claim is governed by the words of the quoted statute. It is utterly unnecessary and improper to force the *Christian* tort into imprisonment within either of the two traditional common-law rubrics for tort liability.[22]

## V

## SUMMARY

¶ 16 The court's holding today expands the bad-faith tort beyond both its contemplated and previously pronounced boundaries. The requirement of "bad faith" now seems to exist solely in the shorthand title of the tort and not as an evidentiary requirement for imposition of liability. Insurers doubtless made an error. A jury found their actions unreasonable. Though deemed unreasonable, the insurers' actions were not shown to have been taken in bad faith. The court

seems to indicate that the insurers were duty-bound to produce Mr. Badillo for a statement. If so, that action would likely have conferred a benefit solely upon the third party. If the step had been taken, the insurers would have ignored the risk of the insured's criminal prosecution solely for the sake of relieving themselves of potential civil liability. **Today's message stands the bad-faith tort upon its head and leaves the insurance business in a quandary.** This is so because the newly added bad-faith tort elements are applied retrospectively against two unsuspecting insurers.

¶ 17 Detrimental impact of unforeshadowed change in the applicable law must be given prospective effect to protect vanquished litigants against unforeseeable consequences from conduct (or omission) regarded as nonactionable at the time of its occurrence. If today's pronouncement is to serve as the effective common-law norm for an insurer's good-faith deportment, its application should be confined, at a minimum, **to claims that will arise after the date mandate has issued in this case.**[23]

¶ 18 I shall have no part of the court's analysis. By application of the precedential standards of yesteryear the insurer's conduct did not, on this record, amount to bad faith. I must hence recede from the judgment and from the opinion by which it is pronounced.

---

**21.** In contract law, bad faith means virtually the same as reckless indifference does in the law of torts. Bad-faith performance, like harmful actions taken with reckless abandon, are equally serious duty breaches though the former lead generally to contractual and the latter to delictual liability.

**22.** In *Christian, supra* note 1, the court was free to create the new tort and place it into one of the traditional rubrics of tort liability. *See supra notes 18–20.* It did not. The *Christian* tort is unique to modern-day common law and is properly governed by its own standard of care rather than by one created long ago. "Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of stare decisis [ . . . ]. If this were not so, we must succumb to a rule that a judge should let others 'long dead and

unaware of the problems of the age in which he lives do his thinking for him.' " *Brigance v. Velvet Dove Restaurant, Inc.,* 1986 OK 41, ¶ 10, 725 P.2d 300, 303 (quoting *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105, 110 (1962) (quoting William O. Douglas, *Stare Decisis,* 49 Colum.L.Rev. 735, 736 (1949))).

**23.** See *Tibbetts v. Sight·n Sound Appliance Centers, Inc.,* 2003 OK 72, ¶ 31 n. 56, 77 P.3d 1042, 1066 (Opala, V.C.J., dissenting in part). "[S]ince said case [here, *Christian* ] was the rule of law in this State when the rights of the parties became vested in the instant action, the rule of law announced herein should be prospective only and shall not affect the judgment rendered in the instant action." *American–First Title & Trust Company v. Ewing,* 1965 OK 98, ¶ 40, 403 P.2d 488, 496.